**In re DOW CORNING CORPORATION, Debtor.**

**No. 95–20512.**

United States Bankruptcy Court, E.D. Michigan, Northern Division.

June 22, 2000.

306

Craig J. Litherland, Houston, TX, Peter A. Nolan, Sheinfeld, Maley & Kay, P.C., Austin, TX, for Debtor.

Patrick L. Hughes, Verner, Liipfert, Bernhard, McPherson and Hand, Char-

tered, Houston, TX, Kenneth H. Eckstein, Kramer Levin Naftalis & Frankel LLP, Tallahassee, FL, for the Official Committee of Tort Claimants.

Ruth A. Harvey, Mary R. Bohan, Anne M. McCormick, Glenn D. Gillett, Lacy R. Harwell, Washington, DC, for United States Government.

## OPINION ON JOINT MOTION OF DOW CORNING CORPORATION AND THE OFFICIAL COMMITTEE OF TORT CLAIMANTS FOR SUMMARY JUDGMENT DISALLOWING UNITED STATES' CLAIMS

ARTHUR J. SPECTOR, Chief Judge.

This matter is before the Court on the Debtor's and the Official Committee of Tort Claimants' (the "Movants") Joint Motion for Summary Judgment Disallowing United States' Claims (the "Motion"). The Movants' primary assertion is that the United States' claims are either defective, incomplete or undocumented and, therefore, are incapable of being proven as a matter of law. Secondary grounds include the Movants' contention that one of the Government's proofs of claim was filed on behalf of the wrong party and that the applicable statute of limitations bars substantial portions of the Government's claims. The Motion further seeks summary judgment on the Movants' request to disallow, pursuant to 11 U.S.C. § 502(e), and subordinate, pursuant to § 509, those claims of the Government that are not disallowed by the Court. Resolution of this matter constitutes a core proceeding within the jurisdiction of the Court. 28 U.S.C. §§ 1334, 157(a), (b)(2)(B). For the reasons which follow, the Motion is granted in part and denied in part.

### I. Background

### A. Nature of Claims Filed by the United States and Objections Thereto

On January 14, 1997, the United States filed proofs of claim on behalf of four federal agencies: Department of Defense ("DoD"); Department of Veterans Affairs ("VA"); Indian Health Services division of Department of Health and Human Services ("IHS"); and Health Care Financing Administration ("HCFA"). The claims seek to recover the costs of medical care either provided or paid for by these agencies as a result of injuries allegedly caused by breast implants manufactured by or containing materials supplied by the Debtor. The HCFA claim is based on the Medicare Secondary Payer Act ("MSPA"), 42 U.S.C. § 1395y. The IHS, VA and DoD claims are based on the Federal Medical Care Recovery Act ("MCRA"), 42 U.S.C. §§ 2651–2653.

The proof of claim filed on behalf of HCFA originally sought reimbursement for an unstated amount of Medicare payments for medical care provided to 10,879 unidentified individuals. *Movants' Ex. I: Declaration of Linda A. Ruiz of HCFA in Support of Proof of Claim ("Decl. of Ruiz")* at 11. It was clear from this declaration, however, that the Government intended to expand the scope and amount of its HCFA proof of claim beyond these unidentified individuals. *Id.* at 11–12. The proof of claim filed on behalf of DoD was for $58,710,039. *Movants' Ex. J: Declaration of Mark B. Barta in Support of DoD Proof of Claim* at 4–5. This amount consisted of an estimated $9,406,039 of medical care provided to 4,123 unidentified individuals as well as a $49,304,000 estimate for the costs of breast-implant-related medical care that DoD expected to provide post-confirmation. *Id.* at 4–5. The VA proof of claim was for $1,091,834 for services provided to 135 unidentified individuals and an unknown amount of medical care expected to be provided post-confirmation. *Movants' Ex. K: Declaration of Nancy Howard in Support of VA Proof of Claim* at 2–5. The IHS claim was for an unstated amount for services provided to 58 unidentified individuals as well as anticipated post-confirmation medical care. *Movants' Ex. L: Declaration of Leo J. Nolan in Support of IHS Proof of Claim* at 6–7.

The Government's original proofs of claim were woefully inadequate, a point never seriously disputed by the Government. *See Transcript*, February 5, 1998 at 101–04 (counsel for the United States stating that it did not yet know the identities of the federal beneficiaries underlying its claims but that it was in the process of gathering additional information); *Transcript*, July 16, 1998 at 85 (counsel for the United States acknowledging that its proofs of claim were "incomplete"); *Transcript*, August 6, 1998 at 213 (counsel for the United States explaining that it intended to supplement its proofs of claim). Some nine months after filing the proofs of claim, the Government still had not amended them to be in compliance with Official Form 10. On October 29, 1997, the Debtor filed its objections.

For each of the Government's claims, the Debtor argued that the United States' right of recovery was dependent upon its ability to establish the Debtor's tort liability to the individual breast implant claimants who form the basis of its claim. The Debtor maintained that, among other things, this would require the Government to identify each of these individual breast implant claimants. And, as the Debtor noted, not one federal beneficiary was identified in the United States' proofs of claim. The Debtor also asserted that, as an entity co-liable with the Debtor on the primary claims, the United States' claims were subject to disallowance pursuant to Bankruptcy Code § 502(e)(1). Finally, the Debtor argued that those claims not otherwise subject to disallowance were subject to mandatory subordination pursuant to Bankruptcy Code § 509(c). *See, e.g., Claim Objection No.4: First Amended Objection to the Medicare Claim of the United States* at 6.

The United States responded to the Debtor's objections on January 22, 1998. It argued that HCFA's ability to obtain reimbursement from the Debtor pursuant to the MSPA was not predicated on a finding that the Debtor was liable in tort to the individual breast implant claimants underlying its claims. It also asserted that § 502(e)(1) and § 509(c) were not applicable to any of its claims because the Government was not an entity co-liable with the Debtor within the meaning of those Code sections. In the event that the Court found otherwise, however, the Government argued that its claims should not be disallowed pursuant to § 502(e)(1)(B) because they are not contingent. The United States would then be able to pursue allowance of its claim under either §§ 502 or 509(c). But the Government maintained that it would not be in a position to make such an election until it had been able to identify the nature of its claims. Problematically though, it stated that it could identify the nature of its claims only by analyzing the proofs of claim filed by individual breast implant claimants, something that it was being prevented from doing due to this Court's order sealing such information. *See, e.g., Claim Objection No. 4: Initial Response of the United States of America to the Medicare Claim Objection* at 6.

The Official Committee of Tort Claimants ("TCC") joined the fray when it filed four adversary proceedings against the United States on March 12, 1998. But for the fact that each of the adversary proceedings asserted a cause of action seeking to equitably subordinate the Government's claims pursuant to Bankruptcy Code § 510(c), the TCC's substantive and procedural objections were essentially identical to those raised by the Debtor.

To avoid confusion and unnecessary duplication of effort, the Court bifurcated from the adversary proceedings all issues raised therein, save for the issue of equitable subordination, and joined those issues with the Debtor's objections. *Order Bifurcating and Consolidating Issues for Trial*, August 20, 1998.[1] The next day the

1. Equitable relief may be obtained only through an adversary proceeding.

Court entered a scheduling order for the trial of the Movants' now-joint objection to the United States' claims. *See, e.g., Claim Objection No. 5 Scheduling Order* ("Scheduling Order"), August 21, 1998. The Scheduling Order provided that all discovery, other than discovery pertaining to expert witnesses and the issue of tort causation, was to be completed by March 5, 1999.[2] *Id.* At the request of the Movants, this deadline was later extended to April 29, 1999. *Transcript,* April 15, 1999 at 51–55. Finally, on stipulation of the Movants and the Government, the deadline was again extended, this time to May 30, 1999. *Order to Revise Discovery and Dispositive Motion Deadlines* (entered May 7, 1999).

### B. Orders Sealing Certain of the Claims Databases

After filing for relief under chapter 11, the Debtor sought permission to file certain portions of its schedules containing the names of breast implant claimants under protective seal. *First Amended Expedited Motion for Authority to File Certain Portions of the Schedules, the Matrix and Certain Certificates of Service Under Protective Seal* ("Matrix Motion"), filed June 21, 1995. The names of breast implant claimants covered by this request came from two sources. One source was the Implant Information Center ("IIC") operated by the Debtor during the four years prior to its filing for bankruptcy. The primary mission of the IIC was to "respond and provide current information to women with Dow Corning silicone gel-filled breast implant devices." *Id.* at 2. Women who contacted the IIC frequently expressed concern over the issue of confidentiality. As a result, the Debtor began

making a formal confidentiality statement to all callers. *Id.* at 3.

The second source was a legal proceeding in which the Debtor participated prior to bankruptcy—the silicone-gel breast implant multidistrict litigation pending at that time before the Honorable Sam Pointer in federal district court in Alabama ("MDL 926"). A tentative global settlement was reached in those proceedings and notice of the settlement was sent to approximately 600,000 breast implant claimants. The notice specifically provided that women who registered with the global settlement would have their names and addresses kept confidential. *Id.* at 4. Some 400,000 women registered.

Upon filing for bankruptcy, the Debtor was required to schedule the names of all known breast implant claimants. 11 U.S.C. § 521(1). It could not file the names in the IIC database, however, without violating the confidentiality agreements reached with the women whose names were contained therein unless such data could be filed under protective seal. A similar problem existed with respect to the global settlement database because Judge Pointer would release the names of the 400,000 registrants only on the condition that confidentiality would be continued. *Matrix Motion* at 4–5.

Concluding that the relief requested by the Debtor was appropriate, the Court entered an order to this effect on June 22, 1995. *Order Authorizing Debtor to File Certain Portions of the Schedules, the Matrix and Certain Certificates of Service Under Protective Seal* ("Matrix Order"). The order also provided "that upon notice, hearing, and a showing of good cause, any party-in-interest may request access to any portion of the documents subject to

---

F.R.Bankr.P. 7001(7). It was for this reason that the TCC's request for equitable subordination could not be joined with the Debtor's objections. However, the issue of mandatory subordination pursuant to § 509(c), which was raised by the Debtor in its objections, remains part of the present proceeding and is addressed in Part VI.F *infra.*

**2.** In products liability actions, causation usually encompasses product identification as well as product defect. *See, e.g.,* 63 *Am Jur 2d,* Products Liability §§ 19 and 73. But as explained in greater detail *infra* Part VI.C, all parties understood the Scheduling Order's use of the term "tort causation" to pertain solely to the issue of product defect.

this Order, or may move the Court to withdraw the protective seal as to any portion or all of the documents subject to this Order." *Id.* The Government did not oppose the requested relief, nor did it appeal the Court's order granting such relief.

On August 8, 1996, the Court entered an order establishing, among other things, a bar date for the filing of proofs of claims against the Debtor and approving a specialized proof of claim form to be used by claimants in this case. *Order Regarding Debtor's Renewed Motion for Order (1) Setting Bar Date for Filing Proofs of Claim; [and] (2) Approving Alternative Proof of Claim Forms....* ("Bar Date Order"). The specialized proof of claim form required the personal injury claimant to provide certain information—such as the claimant's social security number and date of birth—that is not asked for on the official proof of claim form. *See Ex. 4 to Bar Date Order; see also Official Bankruptcy Form 10—Proof of Claim.*

At the request of the TCC, the Bar Date Order provided that the implant proofs of claim would be filed in confidence. *Bar Date Order* ¶ 11. But the order further explained that the maintenance of this confidentiality was neither indefinite nor absolute:

> [T]he Court rules that the information in the Implant Proof of Claim Form will not become public unless the Court determines that the class of Implant Claimants may be entitled to receive payment on their claims, or otherwise modifies the confidentiality provisions of this Order. In such event, the information shall become public without further notice to the individual claimants. Moreover, during the pendency of this bankruptcy case, the Debtor and its professionals, the official committees representing various creditor groups and their professionals, and the docketing agent will be allowed to use the information contained therein on a confidential basis for proceedings in this bankruptcy case, as will other parties in the bank-

ruptcy case who receive permission from the Court.

*Id.* The implant proof of claim form provided to claimants contains almost identical language. *Ex. 4 to Bar Date Order.*

The Government did not object to the confidentiality provision of the Bar Date Order. It did, however, request and receive permission to file its proofs of claim on Official Form 10. *See Bar Date Order* ¶ 9 ("Notwithstanding anything herein to the contrary, the United States government and any of its agencies may file claims on Official Form 10.").

Thus, there are two confidentiality orders in this case. One protects the identities of implant claimants listed on the Debtor's schedules (the "Matrix Order") and the other protects the information submitted by implant claimants on their proofs of claim (the "Bar Date Order") (jointly, the "Confidentiality Orders").

### C. Discovery Process

From the beginning, the Government has maintained that to prove its case against the Debtor, it must have access to the information sealed by the Confidentiality Orders. *See Motion of the United States for Relief from Confidentiality Orders of the Bankruptcy Court ("Motion for Relief")* at 2–3 (filed March 12, 1998) ("The United States needs to know the identity of the women who have brought lawsuits, asserted claims ..., or have otherwise advised the Debtor of injuries arising from breast implants ... in order to calculate the amount of its claim against the Debtor."). And its attempts to access such information began prior to entry of the Scheduling Order. *See U.S. Ex. 32* (letter from counsel for United States to counsel for the Debtor, dated August 15, 1995, stating that Debtor needed to provide it with information protected by the Matrix Order before meaningful settlement negotiations could begin).

The Government stated that it "anticipated receiving this information from [the

Debtor] cooperatively because, under the MSP [Act], [the Debtor] has an affirmative obligation to identify to the United States persons who have or may reasonably expect to receive payment from a products liability settlement." *U.S. Opposition to Motion* at 5. In support of this statement, the Government quoted the following regulation: "If Medicare is not reimbursed as required ..., the third party payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party." *Id.* at 5 n. 1 (quoting 42 C.F.R. § 411.24(i)(2)). The affirmative obligations that the MSPA places upon an entity such as the Debtor are discussed in greater detail below. Suffice it to say at this point, however, that this provision does not place an entity in the untenable position of having to violate a court order, particularly one granting a request for relief which the United States chose not to oppose. Quite properly, then, since complying with the Government's request would have required the Debtor to violate this Court's Confidentiality Orders as well as the confidentiality order entered by Judge Pointer in connection with MDL 926, the Debtor declined to do so.

Almost three years after the petition date, the United States finally sought permission from the Court, as is explicitly required by the Confidentiality Orders, to access the confidential databases. *See Motion for Relief.* The United States argued that it needed access to the confidential information so that it could: identify all of the federal beneficiaries who form the basis of its claim; establish that a Dow Corning breast implant was involved in the medical care provided to those beneficiaries; and "calculate the amount of its claim against the Debtor." *Id.* at ¶ 7; *see also, e.g., Transcript,* August 6, 1998 at 195 and 204. The Government also stated that it would undertake to maintain the confidentiality of the information with two exceptions: it would not waive its right to use the information to obtain reimbursement directly from the beneficiaries; and to the extent that it was required to disclose the

information pursuant to the Freedom of Information Act, 5 U.S.C. § 552a, it could not promise to keep the information confidential.

The first hearing on the United States' Motion for Relief was conducted July 16, 1998. The Confidentiality Orders both anticipated that any party seeking access would be required to demonstrate a need for the information before such access would be granted. *See Matrix Order* (providing that access to the information would be granted "upon notice, hearing, and a showing of good cause"); *Bar Date Order* at ¶ 11 (stating that a party-in-interest would be granted access to the information only upon "receiv[ing] permission from the Court"). At the hearing, the Government failed to proffer any evidence in support of its motion and, as a result, the Court declined to rule on the matter. *Transcript,* July 16, 1998 at 120 ("[O]n your motion for lifting of the confidentiality, ... I will require proofs.... So I'm not about to decide that now.").

When the matter came before the Court again on August 6, 1998, the Government announced for the first time that it intended to call a witness in support of its motion. *Transcript,* August 6, 1998 at 171. The Movants, not having had an opportunity to depose this witness, objected. *Id.* at 171–73. The Court sustained the objection, but offered to adjourn the hearing so that the deposition could be conducted. *Id.* at 177. This offer was declined by the Government. Instead it offered, without objection, the depositions of two Government employees. *Id.* at 178–82. As it turned out, the deposition testimony appeared to cut both ways and the Court expressed skepticism as to whether the Government had made a sufficient showing of need. *Id.* at 188–92, 197–200 and 225–26. And while the Government softened its stance somewhat during the hearing, *see id.* at 215, the Court remained troubled by the conditions the Government sought

to place on its receipt of the confidential information. *Id.* at 282–83.

In the end, the Court did not rule on the United States' motion, suggesting instead two alternatives which were felt to be preferable. One alternative was for the Government to approach Judge Pointer and request that he modify or lift his confidentiality order. *Id.* at 293. The thought was that if the Government could prevail on such a request, then this Court would be in a position to lift, or at least substantially modify, the Matrix Order. *Id.* at 206–08.

The second suggestion was for the United States to provide the Movants with a list of all federal beneficiaries forming the basis of its claims. The Movants would then cross-match the list against their confidential databases and provide the results to the Government. *Id.* at 224 and 289. At that time, the United States allegedly possessed a list of about 15,195 federal beneficiaries whom it had identified as having undergone some type of breast-implant-related surgery. But the intent was to have the Government augment this list before submitting it to the Movants by expanding its internal search to retrieve the names of federal beneficiaries who had received treatment for a broader range of illnesses, such as lupus and scleroderma. *Id.* at 289.

Presumably, the second alternative would have enabled the Government to reduce its subsequent internal search of medical records to a more manageable size. *Compare U.S. Opposition to Motion* at 15 (asserting that it would be impracticable to search the underlying medical files for identified DoD beneficiaries because, due to the Debtor's share of the breast implant market, less than "half of these records could ... be expected to yield any ... references" to the Debtor) *with Transcript,* August 6, 1998 at 226–27 (counsel for the United States stating that, if the Government knew which of the federal beneficiaries thus far identified had also filed proofs of claim against the Debtor, it would be able to "go back to [its] records and pull ... all ... relevant medical [files].”). Approaching the problem in this manner would have also eliminated lingering concerns about the conditions that the Government wanted to place on its receipt of the confidential information. *Transcript,* August 6, 1998 at 282–83. The Movants appeared to be amenable to this approach. *Id.* at 247–48. But the Government initially balked, stating that its agencies would hesitate to provide such a list to the Movants due to concerns that doing so could violate the Privacy Act. *Id.* at 263–64.[3] By the end of the hearing, however, the Government appeared to have acquiesced. *Id.* at 289. Thus, the hearing concluded with the understanding that the parties would cooperate to implement the Court's suggestions.[4]

**3.** The Government's concerns about the Privacy Act eventually proved to be a surmountable hurdle. *See U.S. Ex. 37* (stipulation and order on Privacy Act issues entered February 22, 1999). But this statement of concern touched upon what appears to have been a much bigger problem for the Government: its own client. The four federal agencies appear to have been less than cooperative in providing the Department of Justice with the information that it needed to pursue their alleged claims against the Debtor. *See, e.g., Transcript,* August 6, 1998 at 280 ("I don't have any names or Social Security numbers for DoD. Because of privacy concerns they didn't give them to me.... They gave me—here's your 1 through 3,100 files. And they kept the key.... And believe me, it has been an extended negotiation process to permit us, their

lawyers, to access the key and match the names to the data.").

**4.** The United States has frequently complained that, except for itself, access to the confidential information has been granted, by stipulation, to every party in interest that has requested it. *U.S. Opposition to Motion* at 7. In this sense, the Government intimates that it is being singled out and treated unfairly. But the Government's complaints leave out some crucial facts. For one thing, as the above discussion illustrates, concerted efforts were made to accommodate the needs of the Government. Second, contrary to the United States, every other party in interest that has requested and received access to the confidential information has agreed to maintain the information in absolute confidence. And

Unfortunately, this was never done. And the blame for this inertia rests squarely on the Government. There is no indication that the Government ever approached Judge Pointer to obtain relief from his confidentiality order. As for the Court's second suggestion, it appears that the Government did nothing. Court records show that the Government made no attempt to construct a fully comprehensive list of all the federal beneficiaries potentially underlying its claim. *See, e.g., Transcript,* June 17, 1999 at 52–53.[5] Nor did it return to the Court in a timely manner seeking to fashion some other form of relief. Instead, it sat idle for the next four months. Then, on December 3, 1998, it propounded formal discovery requests upon the Movants seeking, in large part, the exact same information protected by the Confidentiality Orders. Not surprisingly, the Movants objected to this portion of the Government's discovery request. Six months later, on May 28, 1999, the Government filed its *Motion to Compel and Renewed Motion for Relief From Confidentiality Orders.* A hearing on this motion was conducted June 17, 1999.

At the hearing on that motion it was revealed that the Government had finally amended its proofs of claim to actually identify 15,048 federal beneficiaries. *See Transcript,* June 17, 1999 at 30–48. From this it was apparent that the Government had done little more than impart the identities of the federal beneficiaries who formed the basis of its original proofs of claim filed in January of 1997.[6] The

---

perhaps most importantly, it appears from the record that those parties who were granted access did so by compiling a list of claimants from their own records. They then submitted this list to the Debtor which cross-matched this list against the confidential databases. *See Transcript,* August 6, 1998 at 246.

**5.** At this hearing, the Government made the following statement: "[T]here are many diagnostic codes that we could have used that do come up as complaints that women ... claim [are] related to Dow [Corning] ... silicone breast implants. And of course some of those may be autoimmune type diseases, lupus, and a variety of others. We did not use those codes because ... [they] also include a huge universe of other type causes. Therefore if we had used a less ... restrictive search we may have come up with 30,000, 50,000, or 100,000 [names] and we would have [had] a much lower level of competence [sic: confidence] that these names ... are related to a breast implant." *Transcript,* June 17, 1999 at 52–53.

This statement is undoubtedly correct. But it was anticipated when the Court made its suggestion at the August 6, 1998 hearing that the list the Government would compile would indeed be over-inclusive. The very purpose of providing such a list to the Movants for cross-matching would have been to extract from this over-inclusive list the names of federal beneficiaries that also filed proofs of claim against the Debtor. And the fact that this over-inclusive list may have included the

names of as many as 100,000 federal beneficiaries should not have been a deterrent. For one thing, while compiling the list may have been somewhat time consuming, it does not appear from the record that it would have been an overly difficult task for the Government. *Transcript,* August 6, 1998 at 290 (counsel for the United States stating that it generally takes about six weeks for HCFA to complete search requests regardless of the potential enormity of such search); *Movants' Ex. F: Deposition of Howard for DoD* at 88–89 (stating that once the procedural and surgical codes to be searched have been identified, initiating the search request is a simple matter of placing an informal ten-minute phone call to the data processing center). Second, there is nothing to suggest that performing the cross-matching for such a list would have been problematic for the Movants. As explained below, the Government eventually provided a list identifying 15,048 federal beneficiaries that the Debtor cross-matched in a matter of days. There is no reason to believe that increasing the list seven-fold would have created significant problems for the Debtor. Moreover, it appears that the Debtor successfully cross-matched a list for Dow Chemical that contained the names of tens of thousands of potential claimants. There is every reason to believe that the same thing could have been done for the Government had it so desired.

**6.** As the following comparison demonstrates, the Government made relatively minor modifications to the list of federal beneficiaries underlying its proofs of claim between the

Debtor's bankruptcy case was four years old by this time and the discovery period had expired. There had been ample opportunity for the Government to expand the scope of its claim beyond these approximately 15,000 beneficiaries, but it had inexplicably refused to do so, apparently operating under the odd and incorrect assumption that it was not responsible for documenting its own claims. As a result, the Court held that the Government's claims were limited to the 15,048 beneficiaries that it had thus far identified. *See Order on Motion to Compel,* dated October, 27, 1999; *In re Dow Corning Corp.,* 244 B.R. 705, 713–18 (Bankr. E.D.Mich.1999).

The Court further ruled that the Government could provide the Debtor with a list containing the names of these federal beneficiaries and that the Debtor would then be required to match those names against the confidential databases. *Order on Motion to Compel.* This matching process yielded a list of approximately 4,908 federal beneficiaries. *Transcript,* September 2, 1999 at 89 and 107. While the breakdown is not clear from the record, it appears that 2,370 of these federal beneficiaries allege that their breast implants were manufactured by Dow Corning whereas most of the others assert that their implant was made with materials purchased from Dow Corning. *Id.* at 108 (statement by counsel for the United States); *U.S. Opposition to Objection to Evidence* at 6. Approximately 4,288 of these federal beneficiaries are allegedly Medicare beneficiaries. The remaining 620 or so beneficiaries are part of either the VA, IHS or DoD proofs of claim. In addition, the Court announced that it would, at some point, enter an order lifting confidentiality in its entirety before any payments could be made under the Joint Plan. *See Transcript,* October 21, 1999 at 24–27.

The Movants likewise sought discovery from the Government. They conducted depositions of representatives of HCFA and the VA on June 24–25, 1998. The TCC served interrogatories and a document request on each of the four federal agencies on September 8, 1998. About this same time, the Debtor propounded its own discovery request upon the Government.

The original due date for responses to the TCC's discovery request was October 9, 1998. At the request of the United States, the TCC voluntarily granted it two extensions. As the second deadline of November 23, 1998 approached, the Government asked the TCC for yet another extension. This time the TCC refused and the Government filed a motion with the Court requesting that it be given until December 22, 1998 to respond to the discovery requests. The Government also filed objections to the TCC's discovery requests on December 22, 1998. At a hearing conducted that same day, the Court held that, by failing to timely file its objections to the TCC's discovery request, the Government had waived those objections. *Order Granting, in Part, and Denying, in Part, the Motion of the United States for Extension of Time to Respond to Discovery Propounded by the Official Committee of Tort Claimants,* entered January 7, 1999. But the Court did grant the United States a *nunc pro tunc* extension of time to December 22 to respond to the TCC's propounded discovery. *Id.*

The Government timely served its responses to the TCC's interrogatories on December 21 and 22 of 1998. The Government's responses to the interrogatories, however, were incomplete. Moreover, the Government failed to comply with the TCC's document request. *See U.S. Ex. 26* (letter from counsel for United States to counsel for TCC acknowledging incom-

date they were first filed and the amendment dates:

| | Federal Beneficiaries Composing Original Proofs of Claim | Federal Beneficiaries Identified on Amended Proofs of Claim |
|---|---|---|
| HCFA | 10,879 | 11,614 |
| DoD | 4,123 | 3,150 |
| VA | 135 | 257 |
| IHS | 58 | 27 |

pleteness of discovery response dated January 28, 1999). Accordingly, the TCC requested that the Government supplement its responses in compliance with the Court's ruling. *See Movants' Ex. P* (letter from counsel of TCC to counsel for United States dated December 24, 1998). Once again the Government delayed, stating that it could not respond to the supplemental discovery requests until the parties entered into a stipulation resolving certain concerns that it had with respect to the Privacy Act. *U.S. Ex. 26* (correspondence from counsel for United States addressing Privacy Act issues). The Movants acquiesced and a stipulated order enabling them to access, on a confidential basis, information that the Government said was protected by the Privacy Act was entered by the Court on February 22, 1999. *U.S. Ex. 37.*

Nonetheless, the United States' recalcitrance in complying with Court-ordered discovery continued. It made no efforts to supplement its admittedly incomplete interrogatory responses or to provide the documents requested by the TCC. *Brief in Support of Motion* at 10–11. And significantly, this was so despite the fact that the deadline for completing all discovery on matters other than expert witnesses and tort causation, March 5, 1999, was fast approaching. *See Scheduling Order* ¶¶ 2 and 3.

On February 25, 1999, the TCC served notice of its intent to depose certain Government employees on March 9, 10 and 11. The United States resisted this effort as well, filing a motion to quash the depositions on March 8, 1999. *See United States' Motion to Quash [TCC] Deposition Notices and Subpoenas Duces Tecum, or, in the Alternative, for a Protective Order.* Somewhat ironically, the United States argued that the depositions should be quashed since they were scheduled to take place after the deadline for completing discovery. *Id.* at 3 ("The United States seeks

protection from the discovery because it is untimely.").

The Movants filed a motion to compel discovery on March 22, 1999. *Motion to Compel Adequate Responses to Discovery.* A hearing was scheduled to be heard on the matter three weeks later on April 15, 1999.

Just prior to the April 15th hearing, the Government provided the TCC certain supplemental information. On April 13, 1999, it produced a list containing the names of 11,614 HCFA beneficiaries. In addition to the individuals' names, the list contained the beneficiaries' health insurance claim numbers, the dates services were provided, the amounts paid by Medicare, and the procedures and diagnosis codes. *U.S. Opposition to Motion* at 21; *U.S. Ex. 38* at 8. The following day, April 14, 1999, the United States produced comparable lists containing the names of 257 VA beneficiaries and 27 IHS beneficiaries. *U.S. Opposition to Motion* at 21; *U.S. Ex. 39.* It also produced a similar list containing the names of 3,150 DoD beneficiaries on April 29, 1999. *U.S. Ex. 28* at 3, ¶ 3.

At the hearing, the Court confirmed its previous ruling that the Government had waived its objections to the TCC's discovery requests. *Order on Discovery Disputes* (dated May 6, 1999) ("[S]ubject to the terms of [the] stipulated order dated February 22, 1999 regarding the Privacy Act of 1974, ... the objections raised by the United States in ... [its] Response to the [TCC's] Interrogatories and Request for Production served on December 21, 1998[and] ... December 22, 1998 are waived and therefore overruled based upon the United States' failure to timely raise the objections as previously found under Order dated January 7, 1999."). The Court further ordered that "the United States ... shall produce for inspection, documents responsive to the [TCC's] interrogatories and requests for production on April 29, 1999...." *Id.; see also Transcript,* April 15, 1999 at 51–55.[7] The

---

**7.** The *Order on Discovery Disputes* was pre- sented to the Court as a stipulated order on

Court's directive clearly informed the Government as to the potential consequences of noncompliance: "[April 29] will be the day to put up or shut up.... Because I very well will say, whatever it is [the TCC] see[s on that day] is all that will be allowed to be produced at trial." *Transcript*, April 15, 1999 at 51–54.

When that day arrived, however, the United States produced files for a mere two-to-three-hundred VA and IHS beneficiaries.[8] On May 28, 1999, the Government disclosed to the TCC the locations where records pertaining to DoD beneficiaries are stored. *U.S. Opposition to Motion* at 22. The locations to which the TCC was directed for purposes of inspecting additional documents—documents which should have been made available on April 29, 1999—were not only numerous, but were situated in various localities around the world. *Id.; see also U.S. Opposition to Motion* at 4 (noting the difficulty the Government itself would have reviewing the medical treatment records of the approximately 15,000 beneficiaries identified, in part, because of "the number and location of medical facilities involved").

About this same time, the United States, at long last, amended its proofs of claim. On April 12, 1999, the Government amended the HCFA proof of claim. The amendment identifies 11,614 beneficiaries and estimates the United States' claim to be, at a minimum, $32,588,197.02. The IHS proof of claim was amended on May 25, 1999 to identify 27 actual beneficiaries. It was amended for a second time on June 10, 1999 to state that the Government estimated the amount of the IHS claim at $227,800.84. The Government amended the VA proof of claim on May 26, 1999 to identify

257 beneficiaries. And although the number of beneficiaries is almost doubled by the amendment, the Government retained the estimated amount of the claim at $1,091,834. Lastly, the DoD proof of claim was amended June 15, 1999 to identify 3,150 beneficiaries. Curiously, while the DoD amendment reduced the number of beneficiaries by nearly 1,000, it did not change the original demand of the claim—$58,710,039.00.

The motion for summary judgment was filed by the Movants on May 28, 1999. A hearing on the matter was scheduled for September 2. On July 9, the Government responded with a brief accompanied by 49 voluminous exhibits. The Movants' reply to the Government's opposition brief asserted that the Government's exhibits were "largely inadmissible." *Joint Reply in Support of Motion* at 4. Then, just one week before the hearing, the Movants filed an *Objection to Evidence Proffered by the United States in its Response to Joint Motion for Summary Judgment Disallowing United States Claims ("Objection to Evidence")*. The Government's response to the Movants' latest volley was filed the morning of the September 2nd hearing. *United States' Opposition to ... Objection to Evidence Proffered by the United States to Defeat Summary Judgment Motion ("Opposition to Objection to Evidence")*.

## II. Movants' Objection to Evidence Proffered by the United States

In this part, the Court addresses three evidentiary matters. The first is the Movants' Objection to Evidence and their renewal of certain of these objections at the hearing. The next matter is the Movants' assertion that the Government's amend-

---

the same date it was entered, May 6, 1999. By this time, of course, the discovery which the Court had ordered to take place on April 29, 1999 had already occurred.

8. There is some dispute as to the number of the VA and IHS beneficiaries with respect to whom the Government produced files on April 29, 1999. The Movants maintain that the Government produced medical files for a

total of 218 federal beneficiaries. *See Brief in Support of Motion* at 7. The United States, on the other hand, professes to have produced medical files for 27 IHS beneficiaries and 257 VA beneficiaries. *U.S. Opposition to Motion* at 15–16; *U.S. Ex. 28* (correspondence from counsel for United States detailing documents produced for the Movants on April 29, 1999) at 3, ¶¶ 1 and 2.

ments to its proofs of claim are impermissible. Lastly, the Court addresses the current status of the discovery process as it pertains to the Government's proofs of claim.

The Movants' Objection to Evidence asserts that 45 of the Government's 49 exhibits submitted in response to the Movants' request for summary judgment should be stricken. *Objection to Evidence* at 3. Included among these 45 exhibits are: the Government's amended proofs of claim; certain redacted HCFA, VA and IHS documents; declarations by Government personnel; depositions of employees of the Debtor and the Government; copies of correspondence authored by counsel for the United States and the Movants; copies of transcripts from previous hearings before this Court; copies of motions, accompanying briefs and responses pertaining to the United States' attempts to gain relief from the Confidentiality Orders and to compel discovery from the Movants; copies of the Confidentiality Orders; and a copy of an exhibit to the Movants' jointly-proposed plan of reorganization purportedly reflecting breast implant market share data. For the following reasons, the Objection to Evidence is overruled.

■ The Movants raise a multitude of objections to the exhibits in question including: improper amendments to proofs of claim; violation of discovery orders; lack of relevance; hearsay; unsubstantiated summaries; violation of the best evidence rule; and improper testimony by a lay witness. For the most part, these objections are made in broad, general terms and fail to direct the Court to the offending portions of each exhibit. Due to this lack of specificity, the Court is unable to address these objections on their merits. *See, e.g.,* 1 *Weinstein's Federal Evidence* § 103.12 (observing that an objection to evidence must be made with sufficient specificity).

At the summary judgment hearing, the Movants renewed their objection to the admissibility of the documentation accompanying the amended proofs of claim submitted on behalf of HCFA and the DoD. The HCFA documentation includes the names of 11,614 Medicare beneficiaries as well as the beneficiaries' Health Insurance Claim number, date of birth, date of treatment, and the procedure or diagnosis codes for such treatment. *U.S. Opposition to Motion* at 11–12. The DoD documentation contains the names of 3,150 federal beneficiaries along with the beneficiary's social security number and the name of the military installation where treatment was provided. *See Transcript,* September 2, 1999 at 61.

Both the HCFA and DoD documentation were obtained from computer databases maintained by the Government. The databases were constructed using information culled from the underlying medical treatment files. In the case of HCFA at least, the information was originally input into the databases of private health care providers and then transferred through a series of contracting intermediaries before finally being input into the United States' computer systems. *Id.* at 109–10 (counsel for United States discussing process by which HCFA compiles its databases). None of the underlying medical treatment files for HCFA or DoD have been produced. Therefore, it has not been possible for the Movants to verify the accuracy of this information.

■ The Movants argued that such documentation constitutes inadmissible hearsay. There is no question that it is hearsay because the documentation is an out-of-court statement offered for the truth of the matter asserted. *See* 5 *Weinstein's Federal Evidence* § 801.02[1]. In fact, the documentation submitted for both HCFA and DoD would appear to constitute double hearsay since the medical files themselves are hearsay. Nevertheless, the Court overrules the Movants' objection. This documentation falls within the hearsay exception for business records, which generally allows for the admissibility of

hearsay evidence if such evidence constitutes a "report ... of ... events ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make ... [such a] report." FRE 803(6).

As long as a proper foundation is laid, computer generated data may qualify as a report for purposes of FRE 803(6). *United States v. Moore*, 923 F.2d 910, 914–15 (1st Cir.1991); *United States v. Briscoe*, 896 F.2d 1476, 1494 (7th Cir.1990); *United States v. Hayes*, 861 F.2d 1225, 1228 (10th Cir.1988); *United States v. Young Bros., Inc.*, 728 F.2d 682, 693 (5th Cir.1984). The process by which HCFA and DoD created the computer database qualifies as a business activity. *See United States v. Hernandez*, 913 F.2d 1506, 1512–13 (10th Cir. 1990) (Immigration and Naturalization Service computer records reflecting alien's application for amnesty constituted business activity); 5 *Weinstein's Federal Evidence* § 803.11[3] at 803–68 (observing that governmental record-keeping activities generally qualify as a business activity). This business activity was conducted on a regular basis by HCFA and DoD. *See, e.g., U.S. Ex. 19: Deposition of Lisa Vriezen for HCFA* ("*Dep. of Vriezen*") at 34–35 (stating that HCFA's computer database is updated every quarter). There is nothing in the record to suggest that these computer-generated reports are untrustworthy. *See, e.g., id.* (supporting document titled "Claims and Utilization Data" explaining HCFA's quality assurance system); *see also* 5 *Weinstein's Federal Evidence* § 803.11[3] at 803–68 (stating that governmental reports are generally considered to be reliable). And while a fair amount of time may have elapsed between the time the medical care was provided to the federal beneficiary and the time the treatment data reached the Government's computers, the record indicates that the process of compiling the data began at or near the time that the medical care was

furnished. *See, e.g., U.S. Ex. 19: Dep. of Vriezen* (supporting document titled "Overview of Health Care Financing Administration" explaining that process begins when health care provider sends claim to Medicare carrier).

Business records are generally not self-proving. Therefore, a proper foundation for admissibility must be laid through the testimony of a witness qualified to explain the record-keeping process. 5 *Weinstein's Federal Evidence* § 803.11[1]. The Movants argue that the Government failed to satisfy this requirement. The Court disagrees. In deposition testimony that is part of the record of this proceeding, employees of HCFA and DoD explained the process by which the data contained in the databases is collected and stored. *See U.S. Ex. 19: Dep. of Vriezen and U.S. Ex. 17: Declaration of Teresa M. Foley in Support of Amended DoD Proof of Claim* ("*Decl. of Foley*"). Such testimony is sufficient to lay a proper foundation for the proffered documentation. *See United States v. Hathaway*, 798 F.2d 902, 906–07 (6th Cir.1986) (testimony is sufficient to lay a proper foundation if it demonstrates that the witness was familiar with the record-keeping system). Therefore, this objection is overruled.

The Movants also asserted that the documentation accompanying the amendments to the proofs of claim were produced in violation of discovery orders and therefore should not be allowed. *Brief in Support of Objection to Evidence* at 11–14. This argument, too, is rejected. The record indicates that each of the Government's proofs of claim was amended prior to the extended discovery deadline. And it appears from the record that the information used to amend the DoD, VA and IHS proofs of claim was timely provided to the Movants on April 13 and 14. *See U.S. Exs. 28, 38 and 39.*

A related issue was raised by the Movants prior to their Objection to Evidence. In their joint reply brief, the Mov-

ants argue that, regardless of the admissibility of the supporting documentation, the amended proofs of claim are impermissible and should not be allowed. *Joint Reply to U.S. Opposition to Motion* at 4–6. While neither the Bankruptcy Code nor the Bankruptcy Rules address the permissibility of amendments to proofs of claim, the general rule is that amendments intended to correct defects or mistakes are liberally allowed. *In re Meade Tool & Die Co.*, 164 F.2d 228, 230 (6th Cir.1947); *United States v. International Horizons, Inc. (In re International Horizons, Inc.)*, 751 F.2d 1213, 1216 (11th Cir.1985); 9 *Collier on Bankruptcy* ¶ 3001.04[1] (15th ed. rev.2000). Under certain circumstances, however, some courts have placed limitations on a creditor's right to amend when that amendment occurs post-bar date or post-confirmation. *Id.*

■ One of those situations is when the amendment actually constitutes the filing of an entirely new claim against a debtor. *Int'l Horizons*, 751 F.2d at 1216–19. In *Int'l Horizons*, the court suggested that a new claim was one that does "not aris[e] out of the same occurrence or transaction as the timely filed proofs of claim[ ]." *Id.* at 1216 (quoting opinion of the lower court).

Here the Government's amended proofs of claim cannot be characterized as new. Like the original proofs of claim, the amendments seek to recover for medical care provided to federal beneficiaries that was allegedly necessitated by their use of a Dow Corning product. And like the original proofs of claim, the amendments assert that the Government's right of recovery stems from the MCRA and the MSPA. The original proofs of claim stated that the Government was seeking to recover for all federal beneficiaries who had received such medical care. The amendments take the necessary step of actually identifying those beneficiaries. The original proofs of claim were clearly incomplete. But it is equally clear that the amended proofs of claim are just that, amendments, and not entirely new claims.

■ Some courts have also held that a proof of claim amendment should not be allowed when the "need to amend ... [is] the product of bad faith or dilatory tactics on the part of the claimant." *Gens v. Resolution Trust Corp.*, 112 F.3d 569, 575 (1st Cir.1997); *see also In re Dietz*, 136 B.R. 459, 468 (Bankr.E.D.Mich.1992) ("[T]he conduct of an amending creditor is relevant insofar as it evidences some improper ulterior motive ... [a]nd for what it's worth, an argument could be made that a creditor's ability to amend a defective claim is jeopardized where the creditor's negligence is particularly blatant."). The fact that it took the Government over two years to amend its proofs of claim to bring them into compliance with Bankruptcy Rule 3001(f) has certainly been frustrating. And it is fair to characterize the Government's behavior during the discovery process as recalcitrant. But the Court does not believe that the Government's actions were so severe that it should be precluded from amending its proofs of claim. Moreover, the Court recognizes that preparing what is in essence 15,048 different proofs of claim is not a task that can be accomplished overnight. Accordingly, the Government's amended proofs of claim will not be stricken.[9]

---

9. This conclusion could easily have gone the other way. By August of 1998, this case was over three years old and the Government's proofs of claim had been on file for 18 months. And it was common knowledge that the Debtor and the TCC intended to seek disallowance of the Government's claims. Thus, by the time the Scheduling Order was entered on August 21, 1998, the Government should have been well on its way to properly documenting its claims. But in fact, it had done very little in this regard. Discovery was originally scheduled to take place over an approximate six-month period ending March 5, 1999. Not only did the Government fail to comply with discovery by this date, but it is apparent that it made little effort to do so. Given the United States' lack of due diligence, it would have been well within the Court's discretion to simply terminate discovery at that point. *See* F.R.Civ.P. 16(f) and 37(b)(2)(B) (granting a court the authority to

 Because discovery is now closed, the Government is precluded from relying upon unproduced medical records for the 3,150 DoD beneficiaries that it has identified. As noted above, rather than producing the DoD medical records for inspection as the Court had instructed, the Government "directed the [Movants] to the DoD facilities worldwide where medical records pertaining to approximately 3,150 DoD implant recipients are stored and could be made available for review." *U.S. Opposition to Objection to Evidence* at 5. F.R.Civ.P. 34(b) provides ground rules for making documents available for inspection. With regard to the place of inspection, the Government argues that Rule 34(b) merely requires the producing party to make the documents available at the place where such documents are kept in the ordinary course of business. *U.S. Opposition to Objection to Evidence* at 15. But this is not what Rule 34(b) provides. The Rule states that the producing party "shall produce [the documents] *as they are kept in the usual course of business* or shall organize and label them to correspond with the categories in the request." F.R.Civ.P. 34(b) (emphasis added). This statement plainly goes to the manner of production, not the place of production. *See* 7 *Moore's Federal Practice,* § 34.13[3] at 34–77 (This language "was added in 1980 as a result of a concern that parties too often deliberately mixed critical documents with others in an attempt to obscure their importance" and was, thus, intended to "prohibit[ ] a party from simply producing a mass of responsive documents in bulk.").

 As for the place of production, Rule 34(b) requires that documents be made available for inspection at a reasonable place. *See* F.R.Civ.P. 34(b) ("The request [for production of documents] shall specify a reasonable time, place, and manner of making the inspection . . . ."). In the present matter, the documents were to be produced pursuant to a court order. The order designated the place of inspection as the office of the United States' counsel in Washington D.C. Importantly, if the Government had felt this location was not reasonable or was impracticable it could have and should have made its objection known when the designation was made on the record at the April 15, 1999 hearing. But it did not do so.

 And as noted, the Government's alternative offer was to produce the documents for inspection piecemeal at dozens of different DoD medical facilities located around the world. It is beyond question that this offer, as the Government itself unwittingly admitted, was patently unreasonable. *U.S. Opposition to Motion* at 4 ("[A] review of [the beneficiaries'] records . . . is not feasible in view of the more than 15,000 federal beneficiaries identified, the number and location of medical facilities involved, and the cost and burden of retrieving and storing massive amounts of minimally useful hard copy data."); *and id.* at 15 ("DoD cannot feasibly locate, retrieve, examine and copy each of the underlying medical files for the nearly 20,000 instances of inpatient and outpatient treatments pertaining to breast implants which its search identified. . . . The inpatient and outpatient admissions records are located at DoD installations and federal facilities throughout the United States and worldwide."). In short, the Government's offer was an empty gesture that was not only contrary to this Court's order but was arguably designed to further frustrate the discovery process. Therefore, the Court precludes the Government from introducing into evidence in this proceed-

prohibit a party from introducing designated matters into evidence when that party has failed to comply with the scheduling order); cf. *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc.,* 173 F.3d 988, 991–92 (6th Cir.1999) ("[C]ourts possess broad discretion to sanction parties for failing

to comply with procedural requirements."). But instead, discovery was extended for an additional twelve weeks. Even then, the Government's compliance was minimal. As the record demonstrates, there has been more than ample opportunity for the parties to complete discovery.

ing or in any future proceeding pertaining to the Government's claims against the Debtor, any DoD medical files that were not produced in the manner directed by the Court on or before May 30, 1999.

### III. Sufficiency of the Government's Proofs of Claim

■■■■ The Movants next argue that the Government's proofs of claim are insufficiently documented and should be disallowed as a matter of law. A proof of claim that is properly executed and filed in accordance with § 502(a) and Bankruptcy Rule 3001(f) constitutes *prima facie* evidence of the claim's validity and amount. *Juniper Development Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir.1993); *In re Holm (Wright v. Holm)*, 931 F.2d 620, 623 (9th Cir.1991). A properly executed proof of claim includes: the creditor's name and address; the basis for the claim; the date the debt was incurred; the classification of the claim; the amount of the claim; and supporting documentation. *Dietz*, 136 B.R. at 462.

■■■■ Because the United States' proofs of claim were deficient when originally filed, they were not entitled to be considered as establishing a *prima facie* case. The United States amended its proofs of claim shortly before the Movants filed their Motion for summary judgment. The amendments identify 15,048 federal beneficiaries, contain documentation indicating when the medical care in question was provided to these beneficiaries and the value of such care. The Court concludes that the portions of the Government's

proofs of claim relating to these identified beneficiaries are sufficient and entitled to be accorded Bankruptcy Rule 3001(f)'s low threshold for *prima facie* validity.[10]

■■■■ The Movants now have the burden of overcoming this *prima facie* validity by presenting evidence that is of equal probative force to that underlying the Government's proofs of claim. *Holm*, 931 F.2d at 623. In practical terms, this means the Movants "must produce evidence which ... would refute at least one of the allegations that is essential to the ... legal sufficiency" of the Government's proofs of claim. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir.1992); *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. BAP 2000). If the Movants are successful in this endeavor, the burden of persuasion shifts to the Government, the party that bears the ultimate burden of persuasion on its proofs of claim. *FDIC v. Union Entities (In re Be–Mac Transport Co.)*, 83 F.3d 1020, 1025 n. 3 (8th Cir.1996); *Holm*, 931 F.2d at 623.

■■■■ According to the Movants, the documentation submitted by the United States in support of the DoD proof of claim is riddled with infirmities. *Transcript*, September 2, 1999 at 60–67. The documentation provides the names of the 3,150 DoD beneficiaries, the name of the military facilities where treatment was provided, the beneficiaries' social security numbers, and the beneficiaries' medical file numbers. *Id.* at 60; *and U.S. Ex. 17: Decl. of Foley* at 6. The beneficiaries were identified by inputting certain surgical and diagnostic codes relating to breast implant

---

**10.** Not content to limit the scope of its claims to the 15,048 identified beneficiaries, the Government argued that the four federal agencies also possess claims against the Debtor for an unspecified number of unidentified beneficiaries. *U.S. Opposition to Motion* at 36. It further argued that it possesses claims against the Debtor for treatment that these agencies might provide to beneficiaries at some point post-confirmation. *See, e.g., U.S. Ex. 1: First Declaration of Lisa Vriezen in Support of Amended HCFA Proof of Claim ("First Decl. of*

*Vriezen")* at 10 ("The [HCFA] claim includes payments already made, as well as payments for care to be provided in the future."). Rejecting this argument, the Court disallowed the unidentified portion of the Government's claim on October 27, 1999. *Order on Motion to Compel* at 2; *see also Transcript,* June 17, 1999 at 78. The Court's reasoning was further explained in a subsequent opinion. *In re Dow Corning Corp.,* 244 B.R. 705, 713–18 (Bankr.E.D.Mich.1999).

surgery into the Government's database. *U.S. Ex. 17: Decl. of Foley* at 2–3. These generalized diagnostic codes are the extent of the information proffered regarding the treatment provided to these beneficiaries. Thus, the Government's supporting documentation does not identify, with any kind of specificity, the medical care provided to the individual DoD beneficiaries. *Transcript,* September 2, 1999 at 64. The DoD proof of claim asserts that the Government is owed $58,710,039.[11] *Movants' Ex. J: Original DoD Proof of Claim.* But there is no explanation as to how this estimate was arrived at or how it relates to the medical care provided to individual beneficiaries. Most importantly, the Government's documentation does not identify the manufacturer of the breast implant that allegedly injured the beneficiary. *Transcript,* September 2, 1999 at 64. And the Government acknowledges this latter point. *U.S. Ex. 17: Decl. of Foley* at 3–4 ("DoD's patient databases do not include data identifying the manufacturer of the medical products, and DoD's list of potential claims likely includes cases where the implant in question was not manufactured by [the Debtor].").

The Movants contend that the documentation proffered in support of the HCFA proof of claim suffers from many of the same deficiencies. *Transcript,* September 2, 1999 at 67. The documentation identifies the names of the Medicare beneficiaries who form the basis of the Government's claim, the beneficiaries' Health Insurance Claim number, date of birth, the surgical and diagnostic codes used to retrieve these names, the date the surgical event took place and the amounts that HCFA allegedly paid for these procedures. *U.S. Ex. 1: First Decl. of Vriezen* at 7–8; *U.S. Ex. 15: Second Declaration of Lisa Vriezen for HCFA* ("*Second Decl.*

*of Vriezen* ") at 5–6. Like the DoD proof of claim, specifics as to the medical treatment actually furnished have not been provided. Details as to how the amount of the HCFA claim was calculated are, to say the least, vague. *See First Decl. of Vriezen* at 9–11; *Movants' Ex. I: Decl. of Ruiz* at 11–13. In addition, the Government has provided no information regarding the identity of the manufacturer of the breast implant that allegedly injured the Medicare beneficiary. *Transcript,* September 2, 1999 at 71; *see also U.S. Opposition to Motion* at 47 (acknowledging that the Government has not produced evidence identifying the manufacturer of the breast implant that allegedly injured the federal beneficiaries).

The above evidence is sufficient of overcome the *prima facie* validity of the HCFA and DoD proofs of claim. The fact that the Government does not know whether a Dow Corning product was even associated with the problems allegedly suffered by the federal beneficiaries is, by itself, sufficient to cast doubt on the validity of its proofs of claim. As a result, the burden of persuasion on the HCFA and DoD proofs of claim reverts to the Government which now has to prove each element of its claims by a preponderance of the evidence. *Allegheny Int'l.,* 954 F.2d at 174.

Documentation filed in support of the VA and IHS claims has similar problems. *See U.S. Ex. 3: Amended IHS Proof of Claim, Table II* (listing the names of the 27 IHS beneficiaries, their social security numbers and the IHS medical center where treatment was furnished); *U.S. Ex. 5: Amended VA Proof of Claim, Attached Table* (listing names of the 257 VA beneficiaries, their social security numbers, date of birth, surgical code for treatment provided, and the date treatment was provided). But as explained, the Government

---

**11.** A large portion of the DoD proof of claim—$49,304,000—is for medical care that it contends it will be required to provide postconfirmation. *Movants' Ex. J: Decl. of Bota* at 5. But as explained, the portion of the Government's claim pertaining to medical

care that has not yet been provided to beneficiaries who are not yet known has been disallowed. *See supra* note 10. Consequently, the actual amount of the Government's surviving claim is for $9,406,039 ($58,710,039 less $49,304,000).

produced medical files for at least some of these beneficiaries during the discovery process. While these medical files undoubtedly will shed light on this portion of the Government's claims, they are not presently before the Court. Thus, the Court does not make any determinations as to whether the Movants have overcome the *prima facie* validity of this portion of the United States' proofs of claims. *See also infra* Part VI.E (denying this aspect of the Motion for Summary Judgment without prejudice).

## IV. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c) (incorporated into bankruptcy through F.R.Bankr.P. 7056); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir.1995). The moving party initially carries the burden of proving that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). Under circumstances such as those before the Court, the burden can be met by relying solely on evidentiary sources listed in Rule 56(c). *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 ("In cases ... where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"); *Cox*, 53 F.3d at 149. The burden will be satisfied upon a showing that the nonmoving party has failed to produce evidence that would create a genuine issue of material fact for the trier of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Kain v. Nesbitt*, 156 F.3d 669, 671 (6th Cir.1998).

Once the moving party has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). Or as the Supreme Court stated in *Celotex:*

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. Accordingly, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. Finally, inferences drawn from the evidence presented must be viewed in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Crabbs v. Copperweld Tubing Products Co.*, 114 F.3d 85, 88 (6th Cir.1997).

## V. Elements of Government's Causes of Action Under the MCRA and MSPA

Before we can determine whether the Movants have established that there is no genuine dispute as to a material fact and that they are entitled to summary judgment as a matter of law, it is necessary to identify the elements that the Government would have to prove at trial.

### A. Government's Cause of Action Under the MCRA

Enactment of the MCRA was a belated response to the Supreme Court's holding in *United States v. Standard Oil Co. of California*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947). *United States v. Trammel*, 899 F.2d 1483, 1486 (6th Cir. 1990); *United States v. Fort Benning Rifle and Pistol Club*, 387 F.2d 884, 885 (5th Cir.1967).

In *Standard Oil*, a member of the armed services was struck and injured by a truck owned by the defendant. *Standard Oil*, 332 U.S. at 302, 67 S.Ct. 1604. The Government bore the costs of the soldier's medical expenses and also continued to provide him his military pay while he recovered. *Id.* The soldier and Standard Oil resolved their dispute in an agreement to which the Government was not a party. The Government then filed suit against Standard Oil, arguing that it was entitled to recover the costs of the medical care and the soldier's pay. The problem for the Government was that there was no substantive theory of tort liability at that time that would sustain such a claim. Consequently, it argued for the creation of a new federal tort claim—tortious "interference with the government-soldier relation." *Id.* at 303, 67 S.Ct. 1604.

The Court commented at length about the nature of the claim which the United States sought to create. It stated that the claim was "not one for subrogation," but was rather an independent claim seeking reimbursement for losses incurred in the discharge of the Government's duty to care for the soldier and for the loss of the soldier's services. *Id.* at 304 n. 5, 67 S.Ct. 1604 ("[I]n effect, [the proposed claim is one] for tortious interference by a third person with the relation between the Government and the soldier and consequent harm to the Government's interest, rights and obligations in that relation, not simply to subrogation to the soldier's rights against the tort-feasors."). In this way, the Court likened the Government's proposed cause of action to an employer's attempt to recover for the loss of an employee's services or a consortium claim asserted by a parent or spouse. *Id.* at 311–12, 67 S.Ct. 1604.

The Court added that the relationship between the Government and a soldier is "distinctly federal in character" and that "the scope, nature, legal incidents and consequences" of such a relationship should be "derived from federal sources and governed by federal authority." *Id.* at 305–06, 67 S.Ct. 1604. And were such a cause of action to be created, the Court stated that it "[knew] of no good reason why the Government's right to be indemnified in [such] circumstances, or the lack of such a right, should vary in accordance with the different rulings of the several states, simply because the soldier marches ... across state lines." *Id.* at 310, 67 S.Ct. 1604. In the end, however, the Court declined the Government's request, concluding that granting it would have had the effect of improperly interjecting the judiciary into the role of "determining and establishing ... federal fiscal and regulatory policies." *Id.* at 314, 67 S.Ct. 1604. Such a role, the Court said, belonged to Congress. *Id.* at 314–17, 67 S.Ct. 1604.

Congress enacted the MCRA in 1962. And there is no question that *Standard Oil* was the primary impetus behind this Congressional action. *See* H.R.Rep. No. 87–1534 (1962) (stating that the statute was being enacted in response to *Standard Oil's* holding "that, in the absence of statute, the U.S. Government has no right of

action against a negligent person who injures a serviceman and by reason of such negligence and resulting injuries losses accrue to the Federal Government"); *see also Trammel,* 899 F.2d at 1486 (observing that the MCRA's "primary purpose [is] to enable the government to recoup some of the millions of dollars it expends annually providing medical care to military personnel whose injuries are the result of the tortious conduct of third parties").

But it must be emphasized that the MCRA was not intended to be a codification of *Standard Oil.* For one thing, legislative history shows that the MCRA was intended to cover more than just the government-soldier relationship. It also applies to non-military direct health care programs furnished by the Government, such as those provided through the VA and the IHS, where recovery difficulties and federal fiscal policy considerations are essentially the same as those pertinent in *Standard Oil. See* S.Rep. No. 87–1945 ("Statutes providing for care by the Department of Defense to military personnel and their dependents, the Public Health Service to Coast Guard personnel and other classes of persons, and the Veterans' Administration to veterans, either are silent or not specific concerning the Government's right of action to effect such recovery.").

 In addition, the Government's recovery under the statute is limited to the costs of the medical care that it paid for or provided to the federal beneficiary. *See* 42 U.S.C. § 2651(a) ("In any case in which the United States is authorized [to furnish medical care] ... to a person who is injured ... under circumstances creating a tort liability upon some third person ..., the United States shall have a right to recover ... the reasonable value of the care ... so furnished...."). Therefore, and unlike the theoretical cause of action in *Standard Oil,* the MCRA does not grant the Government a right to recover for the loss of a federal beneficiary's services. *See, e.g.,* H.R.Rep. No. 87–1534 (Staff Memorandum) ("The bill is not intended to

provide for the recovery of other costs—such as soldier's pay during a period of illness—that the Government might be subjected to as the natural consequence of a tort-feasor's negligence.").

 Even more significantly, the cause of action that the Government sought to create in *Standard Oil* was not one for subrogation. As will be explained in greater detail below, however, the right of recovery that Congress has afforded the Government pursuant to the MCRA is subrogatory in character. *See, e.g.,* 42 U.S.C. § 2651(a) (providing that the United States' right to recover "*shall ... be subrogated* to any right or claim that the injured ... person ... has against such third person to the extent of the reasonable value of care ... furnished") (emphasis added). For these reasons, it is readily apparent that the MCRA provides the Government with a right of recovery that is distinct from the one that it was seeking to create in *Standard Oil.*

### 1. *Elements of the Government's Claim*

In relevant part, the MCRA provides:

In any case in which the United States is authorized or required by law to furnish or pay ... care and treatment ... to a person who is injured or suffers a disease ... under circumstances creating a tort liability upon some third person ... to pay damages therefor, the United States shall have a right to recover (independent of the rights of the injured or diseased person) from said third person, or that person's insurer, the reasonable value of the care and treatment so furnished, ... and shall, as to this right be subrogated to any right or claim that the injured or diseased person ... has against such third person to the extent of the reasonable value of the care and treatment so furnished .... The head of the department or agency of the United States furnishing such care or treatment may also require the [federal beneficiary] ... to assign

his claim or cause of action against the third person to the extent of that right or claim.

42 U.S.C. § 2651(a).

As can be seen, subsection (a) of the MCRA contains two clauses. The first speaks to the Government's right of subrogation; the second refers to an express assignment that the United States can obtain from the federal beneficiary. The Government does not contend that any of its rights against the Debtor arise through assignment. Rather, it relies exclusively on the rights afforded to it pursuant to the first clause. And in this regard, it asserts that it "must prove only the following elements to recover on its claims: 1) that IHS, VA or DoD rendered implant-related medical treatment to a federal beneficiary, or made an implant-related medical payment on behalf of a federal beneficiary; and 2) that the medical treatment was rendered under circumstances making a third party responsible for the medical care." *Opposition to Objection to Evidence* at 9. The Government cites no authority to support its formulation of the MCRA. Moreover, it is clear from the plain language of the statute and the relevant legal authority that this formulation is overly simplistic.

▇ The MCRA provides the Government with a right to recover the costs of medical care provided "to a person." 42 U.S.C. § 2651(a). Both logic and the plain language of the statute dictate that the Government must identify this "person." Such a conclusion is bolstered by the fact that the Government's recovery will depend upon its ability to prove, pursuant to the tort laws of the applicable state, that the defendant committed a tort against the beneficiary and that such tort necessitated the medical care in question. *See infra* Parts V.A.2 & 3. It is, therefore, not surprising that the beneficiary or beneficiaries appear to have been known in every published opinion pertaining to the United States' attempts to recover payment under this statute.

▇ The MCRA requires the Government to establish that it was "authorized or required by law to furnish" the medical care in question as well as the "reasonable value" of such care. 42 U.S.C. § 2651(a); *cf. United States v. Wall,* 670 F.2d 469 (4th Cir.1982) (remanding case to the district court for further proceedings on whether the Government had established the reasonable value of the medical care). From this it follows that the Government must identify the medical care and treatment for which it seeks recovery. The importance of this element was demonstrated by the Government's own admission that its proofs of claim likely contained claims for some medical care having no relation to a Dow Corning product. *Transcript,* June 17, 1999 at 49 (counsel for the United States stating that "[t]here are a myriad of ways" that the data used by the Government to formulate the estimated amount of its claims could be "incorrect"). This conclusion is reinforced by the fact that the Government's claim is founded in tort. It is simply inconceivable that the Government could prove that the beneficiary was injured by the actions of the Debtor and establish the amount of damages without identifying the medical care in question. Nor is there any legal authority that would suggest otherwise.

▇ In addition, the Government possesses a right of recovery only when the injuries for which the medical care or treatment were furnished arose under "circumstances creating a tort liability" upon some third party. 42 U.S.C. § 2651(a). This language unambiguously requires the United States to prove that the third party committed a tort against the beneficiary and that this tort necessitated the medical care in question. *See, e.g., Trammel,* 899 F.2d at 1487; *Holbrook v. Andersen Corp.,* 996 F.2d 1339, 1341 (1st Cir.1993).

### 2. *Government's Claim Is Both Independent and Subrogatory*

▇ The first clause of the MCRA's subsection (a) grants the United States an

independent right of recovery against the alleged tortfeasor. 42 U.S.C. § 2651(a) ("[T]he United States shall have a right to recover ... independent of the rights of the [federal beneficiary]. ..."). *See also, e.g., Trammel,* 899 F.2d at 1487; *Commercial Union Ins. Co. v. United States,* 999 F.2d 581, 586–87 (D.C.Cir.1993). The statute further provides that, as to this independent right, the Government "*shall ... be subrogated* to any right or claim that the injured or diseased person ... has against such third person." 42 U.S.C. § 2651(a) (emphasis added).

But despite the unequivocal wording of the statute, the Government vehemently disagrees with the notion that its independent right of action is also subrogatory in nature. *See U.S. Opposition to Motion* at 51 n.31 ("The United States denies—as it has at every stage of these proceedings, beginning with its Response to the Debtor's Claim Objections—that it is merely [a] subrogation-type creditor."). Instead, it asserts that it possesses two distinct types of claims under the MCRA, an independent claim and a subrogation claim. *Id.* ("The United States has a direct, statutory right to recover from Dow Corning *and* a subrogation remedy.").

Other than making this assertion, the Government does not explain how this can be so. In what way would the two claims be different? More specifically, what would be the basis of a purely independent claim under the MCRA? If the Government's claim is not based upon the tort committed against the federal beneficiary, then there is no legal theory that would enable the Government to seek reimbursement from the party sued. Furthermore, the statute provides that an action brought by the United States must be premised upon the tort committed against the beneficiary. 42 U.S.C. § 2651(a) (providing that an action may be initiated by the Government under the MCRA only when the treatment provided to the federal beneficiary was for an injury that arose "under circumstances creating a tort liability

upon some third person"). And the instant the Government attempts to recover based upon the tort committed against the beneficiary, subrogation applies. *See, e.g., United States v. Studivant,* 529 F.2d 673, 676 n. 6 (3d Cir.1976).

Subrogation, after all, simply means " '[t]he substitution of one person in the place of another with reference to a lawful claim ... so that he who is substituted succeeds to the rights of the other in relation to the ... claim.' " *Commercial Union,* 999 F.2d at 587 (quoting *Black's Law Dictionary* 1279 (5th ed.1979)); *United States v. California,* 507 U.S. 746, 756, 113 S.Ct. 1784, 123 L.Ed.2d 528 (1993); *Executive Jet Aviation, Inc. v. United States,* 507 F.2d 508, 516 (6th Cir.1974); Dan B. Dobbs, *Remedies: Damages—Equity—Restitution* § 4.3, at 251 (1973) ("Subrogation ... means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert his rights.").

The remedy of subrogation, which has its origins in the equity courts of 17th century England, is now broadly available in situations where "the plaintiff has paid the defendant's obligation or an obligation which, as between the two of them, is regarded as primarily that of the defendant." 1 George E. Palmer, *Law of Restitution* § 1.5(b), at 23 (1984); *see also Michigan Hosp. Serv. v. Sharpe,* 339 Mich. 357, 363, 63 N.W.2d 638 (1954) ("Subrogation is an equitable doctrine ... [that] appl[ies] whenever persons, other than mere volunteers, pay a debt or demand which in equity and good conscience should have been satisfied by another." (citation omitted)) (Reid, J., dissenting). The primary goal of subrogation is "to prevent the unjust enrichment of the person whose obligation was paid or who was regarded as having the primary liability." 1 Palmer, *Law of Restitution* § 1.5(b), at 23; 16 *Couch on Insurance 2d* § 61:18 (rev. ed.1999); *see also Cockerham v. Garvin,* 768 F.2d 784, 786 (6th Cir.1985). The right to subrogation may arise by virtue of

an agreement between the subrogee and subrogor, through judicial device *or by statute.* 16 *Couch on Insurance 2d* at § 61:1.

It is readily apparent that the Government's MCRA-based claim fits the classic subrogation mold. The Government is required by law to provide medical care to each federal beneficiary. *Wall,* 670 F.2d at 470; *United States v. Haynes,* 445 F.2d 907, 908 (5th Cir.1971); *Dow Corning,* 244 B.R. at 714. And when the medical care is for injuries caused by a third party the Government acquires a right to recover the costs from that third party. 42 U.S.C. § 2651(a). To prevail on its claim, however, the Government must step into the shoes of the beneficiary and prove that the beneficiary was injured by the third party and that it was this injury which necessitated the medical care furnished by the United States. Moreover, one purpose of the Government's right of recovery is to prevent the unjust enrichment of the third-party tortfeasor at the expense of the United States.[12]

Not surprisingly, courts have had little trouble recognizing the subrogatory nature of the Government's rights under the MCRA. *Trammel,* 899 F.2d at 1487–88; *Cockerham,* 768 F.2d at 786–87; *United States v. York,* 398 F.2d 582, 584 (6th Cir.1968); *Commercial Union Ins.,* 999 F.2d at 586–87; *Thomas v. Shelton,* 740 F.2d 478, 485 (7th Cir.1984); *United States v. Dairyland Ins. Co.,* 674 F.2d 750, 751 (8th Cir.1982); *Heusle v. National Mut. Ins. Co.,* 628 F.2d 833, 837 (3d Cir.1980); *Studivant,* 529 F.2d at 676 n. 6; *Haynes,* 445 F.2d at 909 (citing *Fort Benning,* 387 F.2d at 887); *United States v. Housing Authority of the City of Bremerton,* 415 F.2d 239, 241–43 (9th Cir.1969); *Maddux v. Cox,* 382 F.2d 119, 124 (8th Cir.1967). *But see United States v. Greene,* 266 F.Supp. 976 (N.D.Ill.1967).[13]

**12.** Unjust enrichment can occur in a wide range of scenarios where "the plaintiff has paid the defendant's obligation or an obligation which, as between the two of them, is regarded as primarily that of the defendant." 1 George E. Palmer, *Law of Restitution* § 1.5(b), at 23 (1984). Or as one court has stated, "unjust enrichment exists when a defendant (1) receives a benefit, (2) to the plaintiff's detriment, and (3) the defendant's retention of that benefit would be unjust." *TRW Title Ins. Co. v. Security Union Title Ins. Co.,* 153 F.3d 822, 828 (7th Cir.1998). A benefit is considered to have been received when liability is avoided. *Polec v. Northwest Airlines, Inc. (In re Air Crash Disaster),* 86 F.3d 498, 549 (6th Cir.1996); *TRW Title Ins. Co.,* 153 F.3d at 828–29. Thus, in the context of the MCRA, assume the Government has provided or paid for the medical care of the federal beneficiary and that the contest is between it and the alleged third-party tortfeasor. If it is established that the medical care was necessitated by the third party's tortious behavior, then the obligation to pay for such care rightfully belongs to the third party. Were it permitted to avoid liability, the third party would be unjustly enriched at the expense of the Government. The MCRA eliminates this possibility by subrogating the United States to the rights of the beneficiary to the extent of the costs of such medical care.

**13.** There is a single case which could be construed as holding that the Government's MCRA-based claim is not subrogatory in nature. *United States v. Greene,* 266 F.Supp. 976 (N.D.Ill.1967). *Greene* reasoned that, because the federal beneficiary was not obligated to pay for the medical care he had received from the Government, he was not entitled to recover the costs of such medical care from the tortfeasor. And since the beneficiary could not recover the costs of medical care from the tortfeasor, there was no right to which the Government could be subrogated. *Id.* at 979. The court's reasoning was incorrect for at least two reasons.

First, when Party A pays for the costs of medical care received by Party B, there is no requirement that B be obligated to reimburse A for the costs of the medical care before A can become subrogated to the rights of B. If it were otherwise, an insurer could never become subrogated to the rights of its insured. But of course this is not the case. *See, e.g.,* 16 *Couch on Insurance 2d* §§ 61:1 to 61:448 (rev. ed.1999) (discussing the many circumstances in which subrogation plays an important role in insurance law). In addition, whether a federal beneficiary retains a claim against the tortfeasor for the costs of medical care provided by the Government is irrelevant to the question of the Government's rights as subrogee. *See* 16 *Couch on Insurance 2d* § 61:26 (noting that real party in interest rules typically provide that once an insurer has com-

■■■ Importantly, no conflict arises from the fact that the Government's subrogation claim is also an independent claim. The purpose of subrogation, after all, is to provide the subrogee with the right to pursue recovery from the party having primary responsibility for the debt in question regardless of what action is taken by the subrogor. Consequently, a subrogation claim typically belongs solely to the subrogee. *See, e.g.,* 16 *Couch on Insurance 2d* § 61:37 ("[S]ubrogation results only in a change in the beneficial ownership of the cause and has no effect on the character or underlying basis of the cause of action."). And it is for this reason that once a party becomes a subrogee by fulfilling its obligation to the subrogor, it generally becomes the real party in interest with an *independent* right to pursue the claim. *See, e.g., Safeway Ins. Co. v. Collins,* 192 Ariz. 262, 963 P.2d 1085, 1089 (App.1998); *Orejel v. York Int'l Corp.,* 287 Ill.App.3d 592, 222 Ill.Dec. 811, 678 N.E.2d 683, 692 (1997); *Liberty Mut. Ins. Co. v. National Consolidated Warehouses, Inc.,* 34 Mass. App.Ct. 293, 609 N.E.2d 1243, 1246 (1993); *Smith v. Travelers Ins. Co.,* 50 Ohio St.2d 43, 362 N.E.2d 264, 265 (1977) (citing cases from multiple jurisdictions to same effect); 16 *Couch on Insurance 2d* § 61:26 ("Real party in interest rules or statutes generally require that the insurer-subrogee, who has paid the loss in full, bring suit in its own name against the tortfeasor or other third person, for the reason that when the insured has been fully indemnified by the insurer so that the latter becomes subrogated to the insured's claim against the wrongdoer, the insured no longer has any right of action against such wrongdoer."). For this reason, Courts uniformly recognize that the federal beneficiary does not have the authority to release the alleged tortfeasor from its potential liability to the Government. *See, e.g., York,* 398 F.2d at 584 (recognizing that "the Government's recovery [cannot be] denied because the injured person has given a release to the tortfeasor"). But this is not, as the court in *Greene* erroneously concluded, because of a unique right afforded the Government under the MCRA. *Greene,* 266 F.Supp. at 979–80. Rather, it is simply because a subrogor generally is without the ability to defeat the independent subrogation claim of the subrogee. *See* 16 *Couch on Insurance 2d* § 61:191.

Legislative history further supports the conclusion that the Government has but one claim under clause (1) of subsection (a) of the MCRA and that such claim is both independent and subrogatory. This is true

pensated its insured in full for a loss caused by a third party, the insurer must bring the action against the tortfeasor in its own name).

*Greene* also relied on the fact that in *Standard Oil* the Supreme Court stated that the Government's claim was " 'not one for subrogation.' " *Id.* at 979 (citing *United States v. Standard Oil Co. of California,* 332 U.S. 301, 304 n. 5, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947)). And because the MCRA was enacted in response to *Standard Oil, Greene* concluded that Congress could not have intended to create only a right of subrogation. *Id.* at 980. What *Greene* overlooked was that in *Standard Oil,* the Government sought to create a new federal tort claim for "interference with the government-soldier relationship" that would have enabled it to recover both the costs of medical care and the soldier's pay. *Standard Oil,* 332 U.S. at 303, 67 S.Ct. 1604. Perhaps Congress could have created such a cause of action when it enacted the MCRA, but that is not what it did. Instead, it merely granted the Government the right to seek reimbursement of the costs of medical care provided to the beneficiary by bringing an action under the tort laws of the applicable state. *Cf. Heusle v. National Mut. Ins. Co.,* 628 F.2d 833, 838 (3d Cir.1980) (observing that Congress "made a choice to limit recovery to instances where there was tort liability on a third person for medical expenses."). Interestingly, even *Greene* appears to have recognized that the Government's MCRA-based claim is governed by the substantive tort law of the applicable state. *Greene,* 266 F.Supp. at 978–79 ("[T]he United States recovery may be barred by substantive defenses such as contributory negligence or lack of negligence.").

Finally, to the extent that *Greene* does stand for the proposition that the Government's MCRA-based claim is not subrogatory in nature, it has been abrogated by the Seventh Circuit. *Thomas v. Shelton,* 740 F.2d 478, 485 (7th Cir.1984) (observing that the Government is a subrogee under the MCRA).

despite *United States v. Merrigan*, 389 F.2d 21 (3d Cir.1968), wherein the court appears to have concluded that changes were made to the original draft of the MCRA for the purpose of separating the Government's primary and independent right of recovery from its right of subrogation. *Merrigan*, 389 F.2d at 24. As will be explained, *Merrigan* misunderstood why the original bill was modified.

The original draft of the MCRA stated: "[T]he United States shall be subrogated to any right or claim that the injured ... person ... has against such third person ... with respect to the care ... so furnished...." *See* H.R.Rep. No. 87–1534 (1962) (noting amendments made to original draft of bill). The original draft also provided: "The head of the department or agency of the United States furnishing such care ... may also require the [federal beneficiary] ... to assign his claim or cause of action against the third person to the extent of that right or claim." *Id.* The proposed bill then referred to the Government's right of recovery as a right of *"subrogation or assignment." Id.* (emphasis added).

There appears to have been some concern expressed that if the Government's right was perceived by courts to be one of assignment, as opposed to a pure right of subrogation, its ability to recover could have been significantly curtailed due to the fact that not all states recognized the assignment of personal injury causes of action. *See* H.R.Rep. No. 87–1534 (1962) (letter from Byron R. White, Deputy Attorney General, (later Justice White) to Hon. Emanuel Celler, Chairman of the House Comm. on the Judiciary, August 1, 1961) ("In drafting the [MCRA], consideration was given to the fact that in many jurisdictions an assignment of a cause of action for personal injuries ... is, in varying degree, either not valid at all or not enforcible directly against the third person tort-feasor, and that frequently a mere partial assignment is not so recognized, even if a total assignment would be...."); *cf. id.* (letter from Joseph Campbell, Comptroller General of the United States, to Hon. Emanuel Celler, Chairman of the House Comm. on the Judiciary, August 2, 1961) ("While we understand that some jurisdictions do not recognize an assignment of a right arising from a personal injury in the absence of a statute so providing, we believe that a Federal statute specifically granting the United States an assignment in such cases as here contemplated would either overcome the local rule or provide the necessary statutory authority. Nevertheless, it is apparent ... that the concept of subrogation conforms with the circumstances contemplated by the proposed legislation far more completely than the concept of assignment.").

The bill was amended so that clause (1) of subsection (a) provides: "[T]he United States shall *have a right to recover from said third person the reasonable value of the care and treatment so furnished or to be furnished and shall, as to this right* be subrogated to any right or claim that the injured ... person ... has against such third person ... with respect to the care ... so furnished...." H.R.Rep. No. 87–1534 (language added by amendment emphasized). The second clause of subsection (a), which permits the head of the department or agency that furnished the care to obtain an assignment from the beneficiary, was retained. But importantly, the phrase "subrogation or assignment" was deleted. *Id.*

The effect of these amendments was to clarify that the Government's right of subrogation is distinct from its right of assignment. Referring to the right of subrogation conferred upon the Government pursuant to clause (1) of subsection (a), the legislative history provides: "This amendment makes clear that the United States is granted a distinct right to recover its costs and that this right is to be effectuated through a partial subroga-

tion [14] to any right which the [federal beneficiary] ... may have to proceed against the negligent third party." *Id.* Thus, it was made clear that the Government's right of subrogation is an independent right of action created by federal statute and that such right is not subject to and cannot be limited by state laws pertaining to the assignment of personal injury claims. *Cf. id.* ("Again, by striking out the words 'subrogation or assignment' and inserting the [new language in clause (1) of subsection (a)], it is again emphasized that the remedy of the Government to assert its rights to recover the cost of medical and surgical services is provided by this legislation.").

Thus *Merrigan* was incorrect when it concluded that Congress amended the original bill so that clause (1) of subsection (a) would confer two distinct claims upon the Government, one independent and the other subrogatory. Not surprisingly, *Merrigan* has been abrogated on this point by the Third Circuit's subsequent decision in *Heusle*, 628 F.2d at 837 ("The operation of this statute in the context of a routine negligence case is relatively straightforward; the government simply stands in the position of a favored subrogee to the claim of an injured party against the tortfeasor.").[15]

The plain language of the statute, the established legal authority as well as common sense all belie the Government's contention that it has two separate claims under the first clause of subsection (a) of the MCRA. An independent, non-subrogatory claim would be utterly meaningless for the Government and it is reasonable to surmise that Congress granted the Government subrogatory rights under the MCRA so that its otherwise hollow claim would have some teeth. The unavoidable conclusion is that the Government has but one claim, and it is both independent and subrogatory in character. *See York*, 398

14. The United States is of course "partially subrogated" in the sense that it does not acquire the beneficiary's entire claim against the third party. Rather, the Government is subrogated only "to the extent of the reasonable value of the care and treatment" provided to the beneficiary. 42 U.S.C. § 2651(a). The Government will not be subrogated to any claim for damages that the beneficiary may have beyond the value of medical care that it has provided. *See* H.R.Rep. No. 87–1534 ("By striking out the reference to subrogation or assignment, the distinct right in the Government along with the equally distinct rights of the [beneficiary] are again emphasized. It is clear that independent rights of recovery exist....").

15. A few other cases also seem to suggest that the MCRA confers two separate claims on the Government, one independent, the other subrogatory. In *United States v. Haynes*, 445 F.2d 907, 910 (5th Cir.1971), the Fifth Circuit stated that "[t]he government has an independent right to recovery; it is not merely a subrogee." *Id.* at 910. But the court also recognized that the Government's independent right of recovery is dependent upon its being able to establish that the defendant committed a tort against the federal beneficiary. *Haynes*, 445 F.2d at 909. Moreover, the court did not disagree with the Fifth Circuit's previous holding in *Fort Benning* that the Government has a single claim that is independent and subrogatory. *United States v. Fort Benning Rifle and Pistol Club*, 387 F.2d 884, 887 (5th Cir.1967); *see also United States v. Bender Welding & Machine Co.*, 558 F.2d 761, 765 n. 4 (5th Cir.1977) (observing that the MCRA provides the right to recover the reasonable value of medical care provided to a federal beneficiary from a third-party tortfeasor and that such right is "subrogated to any right or claim that the individual shall have against the tort-feasor"). For these reasons, *Haynes* was merely recognizing that the Government's single right of recovery is imbued with both characteristics.

Like *Haynes*, the Ninth Circuit stated that "the statute gives the United States an independent right of recovery against the tortfeasor; the United States is not merely subrogated." *United States v. Housing Authority of the City of Bremerton*, 415 F.2d 239, 241–43 (9th Cir.1969). As support for this statement, *Bremerton* cited *York*. But in *York*, the Sixth Circuit held that the United States has but one claim. In addition, *Bremerton* held that the Government's claim hinged upon it being able to prove that the defendant's tortious behavior caused the federal beneficiary's injury. Thus, as was the case with *Haynes*, the court was simply recognizing that the Government's claim has the dual characteristic of being both independent and subrogatory.

F.2d at 584 ("[T]he right of the United States is an independent right, subrogated only in the sense that the person sued by the Government must be liable to the injured person in tort."); *Heusle*, 628 F.2d at 837 ("[T]he government simply stands in the position of a favored subrogee to the claim of an injured party against the tortfeasor."); *Fort Benning*, 387 F.2d at 887 ("[P]roperly construed, the [MCRA] creates in the United States an independent right of recovery. This right, however, is 'subrogated' ...."); *In re Orthopedic Bone Screw Products Liability Litig.*, 176 F.R.D. 158, 179 (E.D.Pa.1997); *see also Transcript*, August 6, 1998 at 194 (counsel for the United States stating that while it "ha[s] an independent claim against the [D]ebtor," such claim is also "derivative of [the claimant's] ... rights").

### 3. *Except For Statutes of Limitation, State Law Provides the Rule of Authority*

■ Any lawsuit that the federal beneficiary might initiate against the alleged third party tortfeasor will be governed by the tort law of the pertinent jurisdiction (usually, and hereafter referred to as "state"). Because the Government is subrogated to the rights of the federal beneficiary, logic dictates that its rights under the MCRA will also be governed by state tort law. Comments solicited from the Deputy Attorney General and a Congressional staff report on the MCRA show that when the MCRA was enacted, there was a general understanding that state law would govern any claim brought by the Government under the statute. *See* H.R.Rep. No. 87–1534 (1962) (Deputy Attorney General White's letter to Congressman Celler) (Clause (1) of subsection (a) of the MCRA "provides simply that ... the United States 'shall be subrogated to any right or claim the injured person' may have against the third person 'with respect to the care and treatment so furnished or to be furnished.' Accordingly, if under local law the injured person would have no claim on account of such damages the

United States would also have none; if he would have such a claim, the United States would become entitled to that claim, but to no more."); *and id.* (Staff Memorandum) ("[The MCRA] would permit the United States to exercise the rights of the [federal beneficiary].... If an injured person has no right to recover for the costs of hospital and medical care furnished by the United States, the United States, as subrogee ... of that person, would be unable to recover such costs.").

And every circuit that has encountered the issue, including the Sixth, has at least implicitly reached this same conclusion. *Trammel*, 899 F.2d at 1487 (6th Cir.1990) ("The language of the [ ]MCRA ... clearly limits the government's right of recovery to situations where state law imposes tort liability upon a negligent person."). *See also Holbrook*, 996 F.2d at 1341; *United States v. Travelers Indemnity Co.*, 729 F.2d 735, 737 (11th Cir.1984); *Thomas*, 740 F.2d at 481; *Dairyland Ins. Co.*, 674 F.2d 750; *Heusle*, 628 F.2d at 837 ("The MCRA does not purport to create a federal law of negligence, but rather accepts state substantive law in determining when tort liability exists."); *Studivant*, 529 F.2d at 676 n. 6; *Haynes*, 445 F.2d at 908–09; *Fort Benning*, 387 F.2d at 887 ("[T]he United States['] ... right to recover [under the MCRA] depends upon the determination under state law as to when the circumstances create tort liability in some third person."). *Cf. Commercial Union*, 999 F.2d at 587 (observing that the Government, in asserting its MCRA claim, merely steps into the shoes of the injured federal beneficiary); *Housing Authority of Bremerton*, 415 F.2d at 242–43 (implicitly recognizing that the United States' MCRA-based claim is governed by state law by discussing whether such claim is subject to certain state law defenses). The relevant regulations likewise recognize this fact. 32 C.F.R. § 220.11(b)(2) (stating that determinations of tort liability under the MCRA are governed by sub-

stantive state law). *Cf. U.S. v. California*, 507 U.S. at 757, 113 S.Ct. 1784 (observing that "[t]he traditional rules of subrogation . . . do not necessarily apply to the Government" but noting its previous suggestion in *Standard Oil*, 332 U.S. at 309, 67 S.Ct. 1604, "that state law controls 'where the Government has simply substituted itself for others as successor to rights governed by state law' ").

■■■■■■ It follows that the Government's claims will be subject to substantive state laws which completely negate the existence of a tort cause of action against the alleged third-party tortfeasor. *See, e.g., Trammel*, 899 F.2d at 1487–88; *Heusle*, 628 F.2d at 838; *Fort Benning*, 387

F.2d at 887. For instance, no-fault automobile insurance laws that abolish tort liability in particular situations apply to the Government's claims. *See, e.g., Trammel*, 899 F.2d at 1487–90; *Travelers Indemnity*, 729 F.2d 735; *Dairyland Ins. Co.*, 674 F.2d at 751; *Heusle*, 628 F.2d at 838. *See also Studivant*, 529 F.2d 673 (barring the Government's attempt to recover from a state fund providing relief to victims of financially irresponsible tortfeasors because of its failure to comply with a condition precedent). And though the issue is not presently before the Court, logic suggests that the Government's claims will also be subject to substantive state law [16] defenses and, with the exception of state

---

16. Most courts have in fact held that the Government's rights under the MCRA are subject to substantive state law defenses such as contributory negligence. *Haynes*, 445 F.2d at 909 (If the injured party to whose rights the Government was subrogated was barred from recovery due to his contributory negligence, "[t]hen the United States [also] would be barred from recovery because the existence of [this defense] would negate the creation of any tort liability upon the third party."); *Housing Authority of Bremerton*, 415 F.2d at 243 ("Where the injured party is himself negligent, and where under state law that contributory negligence absolves the third person from liability, then the United States cannot recover from that third person. This is what the statute must mean...."). In *Housing Authority of Bremerton*, the Government was seeking to recover the costs of medical care that it had provided to a child allegedly injured by the negligence of the Housing Authority. 415 F.2d at 240. The Housing Authority argued that the contributory negligence of the child's parents should bar the United States' recovery. *Id.* at 240–41. The court rejected this argument. It reasoned that because the Government was subrogated to the rights of the child, not the rights of the parents, "any possible contributory negligence of the parents was irrelevant" to the Government's ability to recover. *Id.* at 243. *Cf. United States v. Trammel*, 899 F.2d 1483, 1487–88 (6th Cir.1990) (concluding that "state substantive law," not just select portions of that law, "determine whether tort liability exists for purposes of an [ ]MCRA claim"); *Heusle*, 628 F.2d at 838 (same). *Contra United States v. Theriaque*, 674 F.Supp. 395 (D.Mass.1987).

In *Theriaque*, the court observed that only state law defenses which "negate[ ] 'circumstances creating tort liability upon some third person' " bar recovery by the Government. *Id.* at 399. It then concluded that Massachusetts' comparative negligence law did not affect the creation of tort liability. While acknowledging that the state's comparative negligence law could serve to reduce or even eliminate one party's recovery for the tortious conduct of another, the court reasoned that this defense "[did] not affect the creation of tort liability" because it did not mean that the party invoking it was "not negligent." *Id.*

*Theriaque's* reasoning is dubious for a number of reasons. First, defenses available to the defendant do indeed impact upon whether "circumstances creating tort liability exist." A third party may admittedly be negligent. But if there is a state law defense (i.e. comparative negligence) which bars the injured person's claim, no tort liability can be adjudged against that party. *See also infra* note 17. In addition, substantive state laws giving rise to tort liability are interwoven to form a cohesive body of law. Had Congress intended to override certain of these substantive laws and to leave others in place, one would have expected it to have said so. *Cf. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, — U.S. —, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000) (observing that if Congress had intended for 11 U.S.C. § 506(c) to provide certain parties with a right of recovery it would have said so). But neither the MCRA nor its legislative history explicitly, or even implicitly, reflect such an intent. Thus, *Theriaque* is not persuasive.

statutes of limitation, procedural state law defenses as well.[17]

To summarize the Government's rights under the MCRA, it must identify the due to the fact that such laws can be different. But we know that this is not the case.

In addition, letter comments that Congress received regarding the original language of the bill, and which are included in the MCRA's legislative history, strongly indicate that Congress did indeed intend to subject the Government's claims to state procedural defenses. *See* H.R.Rep. No. 87–1534 (letter from the Deputy Attorney General) ("[Clause (1) of subsection (a) ] ... provides simply that ... the United States 'shall be subrogated to any right or claim the injured person' may have against the third person 'with respect to the care and treatment so furnished or to be furnished.' Accordingly, *if under local law the injured person would have no claim on account of such damages the United States would also have none; if he would have such a claim, the United States would become entitled to that claim but no more.*") (emphasis added); *id.* (letter for the Comptroller General) ("[S]ubrogation ... operates to transfer from one person to another a cause of action against a third person. [It] passes to the second person all the rights, privileges, and remedies which the first person has against the third person, *subject to all* equities and *defenses which the third person could have exercised against the first.*") (emphasis added); *id.* (Staff Memorandum) ("If an injured person has no right to recover for the costs of hospital and medical care furnished by the United States, the United States, as subrogee ... of that person, would be unable to recover such costs.").

Had Congress intended to take the extraordinary step of providing the Government with a right of subrogation that would be subject to state substantive laws but free from state procedural defenses, one would have expected the MCRA to expressly state so. This is particularly true given that the Deputy Attorney General, the Comptroller General and the Congressional Staff expressed a contrary understanding of the statute. But there is simply nothing within the statute or its legislative history which even remotely suggests that Congress intended to free the Government's right of subrogation under the MCRA from state procedural defenses.

There is, however, at least one exception to this rule, and that pertains to state statutes of limitation. But the reason for this exception has nothing to do with the MCRA itself. Rather, the procedural bar of limitations is simply unique in its application to Government claims. It has long been held that the doctrine of sovereign immunity precludes the application of any time limitation to a Government claim unless Congress provides oth-

---

**17.** Some courts have held or suggested that state law procedural defenses do not bar the Government. *See United States v. Moore,* 469 F.2d 788 (3d Cir.1972) (holding that the Government's claim under the MCRA was not subject to Maine's state family immunity laws); *Haynes,* 445 F.2d at 910 ("The government's right is independent and is not limited by procedural bars to which [the federal beneficiary] ... might be subject."); *Fort Benning,* 387 F.2d at 887 (The Government's right "is subject only to those substantive state doctrines which create or negate such liability."); *see also Commercial Union Ins. Co. v. United States,* 999 F.2d 581, 588 (D.C.Cir.1993); *United States v. Studivant,* 529 F.2d 673, 675 (3d Cir.1976); *United States v. Gera,* 409 F.2d 117, 119–20 (3d Cir.1969); *Greene,* 266 F.Supp. at 978.

The rationale offered by these courts is generally not persuasive. Some have suggested that state procedural defenses do not apply because the Government's "right is subject only to those ... state doctrines which create or negate [tort] liability" and that procedural defenses "ha[ve] nothing to do with whether the circumstances surrounding the injury create a tort liability in that third person." *Fort Benning,* 387 F.2d at 887; *see also Haynes,* 445 F.2d at 907. This reasoning is flawed for the simple fact that procedural defenses, like all legal defenses, have a considerable amount to do with whether "circumstances creat[e] tort liability upon some third person." If an indisputably negligent person possesses a legal defense—substantive or procedural—that bars recovery by the plaintiff, no tort liability will be adjudged and, therefore, it cannot be said that circumstances creating tort liability exist.

Other courts holding that procedural defenses do not apply have relied on *Standard Oil's* comment that a Government claim for "interference with the government-soldier relationship" should not vary from one state to the next. *Moore,* 469 F.2d at 794; *Haynes,* 445 F.2d at 910; *see also Standard Oil,* 332 U.S. at 310, 67 S.Ct. 1604. Such reliance was misplaced, however, because the MCRA was not a codification of *Standard Oil. See supra* p. 325 (explaining that the MCRA was enacted because of *Standard Oil,* but was not a codification of that case). Moreover, state substantive defenses, like procedural defenses, can also differ from state to state. In fact, the elements of the substantive tort itself can vary among states. Taken to its logical extreme, *Haynes'* and *Moore's* reasoning would mean that the Government's MCRA-based claim should not be subject to any state laws

federal beneficiary underlying its claim and the medical care that was provided to this beneficiary. It must demonstrate that it was authorized by law to provide the medical care in question and the reasonable value of such care. Furthermore, the Government must establish that the medical care was necessitated because of the commission of a tort by a third party against the beneficiary. The Government will be subrogated to the rights of the beneficiary so that its claim will be subject to the tort law of the state.

■ The United States has not identified which states' tort laws would govern its MCRA claims against the Debtor. Thus, it is impossible to know with specificity the elements that the Government would have to prove to establish the Debtor's tort liability as to each federal beneficiary. At a minimum, however, black letter products liability law would require the Government to establish that one of the Debtor's products was involved in the medical care provided to each of the federal beneficiaries and that a defect in the product caused an injury which necessitated such care. *See, e.g., Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89, 92 (D.Md.1989) ("Under traditional products liability law, the plaintiff must prove that the defendant manufacturer made the product that caused the plaintiff's injury."); *Marshall v. Celotex Corp.,* 651 F.Supp. 389, 391 (E.D.Mich.1987) ("The threshold requirement of any products liability action is identification of the injury-causing product and its manufacturer."); *see also* 63 Am. Jur. 2d, Products Liability §§ 4, 19 and 73.

erwise. *See, e.g., E.I. Du Pont De Nemours & Co. v. Davis,* 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924); *United States v. Nashville, Chattanooga & St. Louis Ry. Co.,* 118 U.S. 120, 125, 6 S.Ct. 1006, 30 L.Ed. 81 (1886); *see also Gera,* 409 F.2d at 119–20 (recognizing that this doctrine explains why state statutes of limitation do not apply to MCRA-based claims).

## B. Government's Cause of Action Under the MSPA

Medicare was created in 1965 to provide "federally funded health insurance for the aged, the disabled, and people suffering from end-stage renal disease." *Health Ins. Ass'n of America v. Shalala,* 23 F.3d 412, 414 (D.C.Cir.1994); *see also* Social Security Amendments of 1965, Pub.L. No. 89–97, § 1862(b), 79 Stat. 286, 325 ("Social Security Amendments of 1965"). Except for worker's compensation plans, Medicare was made the "primary payer" for the health care claims of federal beneficiaries with the beneficiaries' other health insurance plans filling in some or all of the coverage gaps. *See* Social Security Amendments of 1965 at 365.

■ Rising Medicare costs eventually led Congress to enact a series of amendments in 1980 which became known as the MSPA. 42 U.S.C. § 1395y(b). The MSPA was "a cost-cutting measure ... designed to make Medicare a 'secondary' payer" when other insurance was available. *Health Ins. Ass'n,* 23 F.3d at 414; *New York Life Ins. Co. v. United States,* 190 F.3d 1372, 1373 (Fed.Cir.1999); *see also Blue Cross & Blue Shield of Texas v. Shalala,* 995 F.2d 70, 72 (5th Cir.1993) ("Congress designed the MSP statute to prevent group health plans from providing that the plan will be the secondary payer if Medicare coverage exists.").

The first paragraph of the MSPA pertains to "group health plans," which are "[health insurance] plan[s] ... of, or contributed to by, an employer or employee organization." 26 U.S.C. § 5000(b)(1); 42 U.S.C. § 1395y(b)(1).[18] Nothing in the

18. The first paragraph actually identifies two types of health insurance plans: "group health plans" and "large group health plans." 42 U.S.C. § 1395y(b)(1). The two terms have roughly identical meanings except that large group health plans are those plans which cover employees of an "employer that normally employed at least 100 employees on a typical business day during the previous calender year." 26 U.S.C. § 5000(b)(2) (defin-

MSPA obligates employers and employee organizations to offer group health insurance to its employees or members. *See Health Ins. Ass'n*, 23 F.3d at 414 n. 2; *United States v. Blue Cross and Blue Shield of Michigan*, 726 F.Supp. 1517, 1522 (E.D.Mich.1989) (hereafter *"BCBS of Michigan"*). But if group health insurance is offered by one of these entities, the first paragraph of the MSPA sets forth certain requirements, such as precluding the entity from offering inferior coverage to an employee merely because she is otherwise entitled to receive Medicare benefits. 42 U.S.C. § 1395y(b)(1)(A)(i) & (B); *Health Ins. Ass'n*, 23 F.3d at 414 & n. 2.

In the next paragraph, Medicare is expressly made the "secondary payer" with respect to certain types of medical care. 42 U.S.C. § 1395y(b)(2). This is accomplished, in the first instance, by generally prohibiting Medicare from paying for any item or service of medical care for which it otherwise would have been obligated to pay, pursuant to subchapter VIII of the Medicare statute (titled "Health Insurance for Aged and Disabled"), if such medical care has been or can reasonably be expect-

ed: to be paid for by a group health insurance plan pursuant to the requirements of paragraph one of the MSPA; or to be paid for "promptly" by a workmen's compensation plan, automobile or liability insurance plan or a no-fault insurance plan. 42 U.S.C. § 1395y(b)(2)(A); *Health Ins. Ass'n*, 23 F.3d at 414.[19] If Medicare nonetheless pays for such item or service, the payment is conditional and subject to reimbursement. 42 U.S.C. § 1395y(b)(2)(B)(i); *Health Ins. Ass'n*, 23 F.3d at 414. To recover a conditional Medicare payment, "the United States may bring an action against any entity which is *required or responsible* ... to make payment with respect to such item or service ... under a *primary plan* ..., or against any other entity ... that has received payment from that entity with respect to the item or service ...." 42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added); *Health Ins. Ass'n*, 23 F.3d at 414.[20] In the discussion that follows, the Court provides a more detailed explanation of the rights afforded the United States under the MSPA.[21]

ing "large group health plan"). The distinction between the two terms is not relevant to the present matter. And for the remainder of the opinion, the Court will use the term "group health plan" to refer to both types of health plans.

**19.** *See also infra* Part V.B.3 (regarding MSPA's method for determining whether there was a reasonable expectation that a particular insurance entity would pay for the medical care in question).

**20.** *See also infra* Part V.B.1 (explaining definition of "primary plan") *and infra* Part V.B.2 (regarding what it means for a primary plan to be required or responsible for the payment of certain medical care).

**21.** Despite the relatively simple structure of the MSPA, it has generated considerable case law. Some of this is due to the complex nature of the statute's subject matter—the regulation of the business of insurance. *United States v. Rhode Island Insurers' Insolvency Fund*, 80 F.3d 616, 619 (1st Cir.1996). But sadly, a significant amount of the legal melee is the direct result of the Government urging statutory constructions, as it has done in this

case, that are entirely unsupported by the statute and which appear to be intended to convert the MSPA from an important and sensibly fashioned fiscal cost-cutting measure into a mere, heavy-handed collection tool.

A number of cases have arisen where multiple parties, including Medicare, each possessed separate claims against the negligent party. The insurance proceeds in these cases were insufficient to pay all of the competing claims in full. *See Waters v. Farmers Texas County Mut. Ins. Co.*, 9 F.3d 397 (5th Cir. 1993) (Five individuals were injured in an automobile accident. The medical care of one individual was paid for by Medicare; the other four individuals paid for their own medical expenses.); *Denekas v. Shalala*, 943 F.Supp. 1073, 1075 & 1077–78 (S.D.Iowa 1996) (The children of a couple who died from injuries sustained in an automobile accident brought wrongful death parental consortium claims against the negligent driver. Medicare sought reimbursement for the expenditures it incurred in paying for the couple's medical care.); *Estate of Foster v. Shalala*, 926 F.Supp. 850 (N.D.Iowa 1996) (The children of a deceased Medicare beneficiary

## 1. Entities Against Whom Government May Initiate Recovery Action Under MSPA

Under the MSPA, the United States is limited to pursuing an independent right of recovery against two types of entities: a "primary plan;" or and entity that has received payment from a primary plan. 42 U.S.C. § 1395y(b)(2)(B)(ii); *Perry v. United Food and Commercial Workers Dist. Unions*, 64 F.3d 238, 244 (6th Cir.1995) (" 'The sole interest of Congress, as far as the statute discloses, was to provide that Medicare would not have to pay ahead of private carriers in certain situations.' " (quoting *Baptist Memorial Hosp. v. Pan American Life Ins. Co.*, 45 F.3d 992, 998 (6th Cir.1995))); *United States v. Rhode Island Insurers' Insolvency Fund*, 80 F.3d 616, 622 n. 5 (1st Cir. 1996) ("[T]he MSP [statute] ... limits reimbursement to recoveries from 'primary plans,' whose definition lists only entities which are clearly 'within' the insurance industry."); *Health Ins. Ass'n*, 23 F.3d at 427 n. * (Henderson, J. concurring) ("[T]he MSP statute plainly intends to allow recovery only from an insurer ...."); *but see Estate of Foster v. Shalala*, 926 F.Supp. 850, 865 (N.D.Iowa 1996) (disregarding the words "primary plan" and erroneously suggesting that "Congress has provided Medicare with a direct right of action against the tortfeasors pursuant to 42 U.S.C. § 1395y(b)(2)(B)(ii)").[22] The Gov-

brought parental consortium claims against the negligent treating physician. The Government sought reimbursement for Medicare payments that it incurred as a result of the doctor's negligence.). In each of these cases', the Government argued that its MSPA-based claim was entitled to absolute priority in the insurance proceeds over the competing claims of the other parties. This argument was easily rejected by the courts. They held that nothing in the MSPA allowed the Government to trump the separate property rights of the other claimants and that the Government was, therefore, entitled to receive no more than what the Medicare beneficiary could recover had she been the movant. *Waters*, 9 F.3d at 400–01 (After reaching this conclusion, the court stated that it was disappointed in "the government's overreaching interpretation of its authority under the [MSP] statute."); *Denekas*, 943 F.Supp. at 1080; *Estate of Foster*, 926 F.Supp. at 864–65. In *Waters*, it appeared that the Government was attempting to recover, at the expense of the other claimants, the cost of cancer treatment it had provided to the Medicare beneficiary which had absolutely nothing to do with the injuries which the Medicare beneficiary sustained in the automobile accident. *Waters*, 9 F.3d at 398 & 401.

Among the other cases demonstrating the extent of the Government's overreaching is *Smith v. Youngblood*, No. 96–2565, 1997 WL 149954, at *1 (E.D.La. March 21, 1997). There, the plaintiff was injured in an automobile accident and received $28,000 in medical care paid for by Medicare. The plaintiff hired counsel and filed suit against the responsible insurer. A year later, the insurer interpleaded the $10,000 policy limit into the court registry. *Id.* The Government then entered the picture and demanded the entire $10,000.

This would have left the plaintiff with no recovery plus responsibility for the attorney fees that were used to generate the $10,000 to which the Government now laid claim. The court spurned the United States' assertion that attorney fees should not come off the top, for the Government's own regulations provided that "[w]hen ... Medicare payments exceed the judgment or settlement amount, 'the recovery amount is the total judgment or settlement payment *minus the total procurement costs*.' " *Id.* (quoting C.F.R. § 411.37(d)).

The Government even attempted to recover from third-party administrators whose sole responsibility was to administer insurance programs for separate insurers and who were in no way "required or responsible" to pay for coverage provided pursuant to such programs. *Health Ins. Ass'n of America v. Shalala*, 23 F.3d 412, 415–17 (D.C.Cir.1994); *United States v. Travelers Ins. Co.*, 815 F.Supp. 521, 523–24 (D.Conn.1992); *United States v. Blue Cross and Blue Shield of Michigan*, 726 F.Supp. 1517, 1521–22 (E.D.Mich.1989). These cases led Congress to amend the MSPA in 1996 to make clear what should have been obvious to begin with—that the Government cannot obtain reimbursement from a third-party administrator that is not required or responsible to pay for benefits under an insurance policy. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii)(now providing that "[t]he United States may not recover from a third-party administrator ... in cases where the third-party administrator would not be able to recover the amount at issue from the employer or group health plan").

22. The MSPA does provide the Government with a right to "join or intervene in any action related to the events that gave rise to

ernment has likewise acknowledged that this is the proper construction of the MSPA. *Opposition to Objection to Evidence* at 8 ("Under the MSP statute, the United States must prove ... that Dow Corning is either a primary plan or received payment from a primary plan.").[23]

The statute defines "primary plan" as either "a group health plan," or, "a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance." 42 U.S.C. § 1395y(b)(2)(A). A "self-insured plan" is defined as "a plan under which an individual, or a private or governmental entity, carries its own risk instead of taking out insurance with a carrier." 42 C.F.R. § 411.50(b)(2). Nothing in the Joint Motion asks the Court for summary judgment on the ground that the

Government has not shown that the Debtor is a "primary plan." The Court nevertheless recognizes that the Movants and the Government disagree on what it takes to be a primary plan.[24]

### 2. Meaning of "Required or Responsible" and Other Relevant Considerations

As explained, when Medicare makes a payment for which a "primary plan" was "required or responsible," the MSPA affords the Government with a right to recover that payment. *Health Ins. Ass'n*, 23 F.3d at 414. In relevant part the statute provides:

> (ii) Action by United States—In order to recover payment ... for ... an item or service, the United States may bring an action against any entity which is

the need for the item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii) (*compare, e.g.,* "the United States *may bring an action* against ... a primary plan" *with* "and *may join or intervene in any action* related to the events that gave rise to the need for the item or service" (emphasis added)). Thus, it is possible for the Government to become a participant in an action against the alleged tortfeasor. But a right to intervene in a pending lawsuit is distinct from a right to actually initiate a lawsuit. Therefore, unless an alleged tortfeasor qualifies as a primary plan or received payment from a primary plan, the MSPA does not grant the United States the right to initiate a direct action against it.

23. Though not relevant to the current proceedings, an additional party against whom the Government may have a right of recovery is a third-party plan administrator "in cases where the third-party administrator would ... be able to recover the amount [of the Medicare payment] from the employer or group health plan ... at the time the action for recovery is initiated by the United States...." 42 U.S.C. § 1395y(b)(2)(B)(ii).

24. For example, the Government argues that all alleged tortfeasors qualify as self-insured plans and that, as a result, all alleged tortfeasors *may be sued directly under the MSPA. Transcript*, February 5, 1998 at 95–96. We are dubious that the term "self-insured plan" covers or was meant to cover every tortfeasor who fails to obtain insurance. *See, e.g.,* 1 *Couch on Insurance* § 1:4. (A "self-insurer" generally refers to "an entity which, rather

than purchasing insurance, undertakes to guard against its own risks by assessing the risks and establishing sufficient reserves to pay any losses which occur."), *Alderson v. Insurance Co. of North America*, 223 Cal. App.3d 397, 407, 273 Cal.Rptr. 7 (1990) ("It is implicit in the term, 'self-insurer,' that such person maintains a fund, or a reserve, to cover possible losses, from which it pays out valid claims, and that the self-insurer have a procedure for considering such claims and for managing that reserve."). In fact, in a program instruction issued in January of 1983, HCFA itself defined self-insurance as " '[a] means whereby a provider(s) whether proprietary or non-proprietary, *undertakes the risk to protect itself against anticipated liabilities by providing funds in an amount equivalent to liquidate those liabilities.*' " *Methodist Medical Center of Illinois v. Sullivan*, No. 87–1283, 1989 WL 162786, at *3 (C.D.Ill. Nov.16, 1989) (quoting HCFA program instruction).

Moreover, the MSPA utilizes the term "self-insured plan." The term "plan" means "a method for achieving an end" or "a detailed formulation of a program of action." *Webster's Ninth New Collegiate Dictionary* 898 (Merriam–Webster 1985). HCFA regulations define "plan" in similar fashion: " 'Plan' means any *arrangement,* oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness." 42 C.F.R. § 411.21 (emphasis added). As the issue is not ripe for decision, these observations are not dispositive.

required or responsible ... to make payment with respect to such item or service ... under a primary plan ..., or against any other entity ... that has received payment from that entity with respect to the item or service, and may join or intervene in any action related to the events that gave rise to the need for the item or service....

(iii) Subrogation rights—The United States shall be subrogated (to the extent of payment made under this subchapter for such an item or service) to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan.

42 U.S.C. § 1395y(b)(2)(B)(ii) and (iii).

### a. *Tort Liability Required in This Case*

The Government interprets the above language to mean that its ability to recover under the statute is dependent upon "the existence of an entity required or responsible to make payment, rather than the existence of a tort." *Opposition to Objection to Evidence* at 8; *see also id.* ("Nowhere does the MSP statute require the United States to prove a tort" as a condition to recovery.). And it maintains that to recover from the Debtor, it merely needs to prove that "Dow Corning made, or reasonably can be expected to make, payment to a Medicare beneficiary, and that Dow Corning is either a primary plan or received payment from a primary plan." *Id.*

Under the Government's proffered formulation of the MSPA, there is no need to show any cause-and-effect relationship. It essentially asserts that it could recover from any party that qualifies as a primary plan or received payment from a primary plan and which makes or can reasonably be expected to make a payment to a Medicare beneficiary, even if the payment made or expected to be made by that party is entirely unrelated to the medical care paid for by the Government. The Government's formulation would add a new twist

to the notion of strict liability, and if this Court were sitting in the former Soviet Union perhaps it would have some merit. As it is though, the Government's asserted formulation borders on the absurd. The United States has offered no authority in support of its formulation. Moreover, its arguments are belied by a common-sense interpretation of the statute.

Congress' decision to use the phrase "required or responsible," as opposed to language similar to that found in the MCRA ("circumstances creating a tort liability upon some third person") is unremarkable when one considers the purpose of the MSPA. Recall that the statute was enacted as "a cost-cutting measure ... designed to make Medicare a 'secondary' payer with respect to [primary plans]." *Health Ins. Ass'n,* 23 F.3d at 414; *New York Life,* 190 F.3d at 1373; *Blue Cross & Blue Shield of Texas,* 995 F.2d at 73. The statute accomplishes this objective by enabling the Government to recover conditional Medicare payments from a primary plan (or an entity that received payment from that primary plan) that was "required or responsible" to make such payment in the first instance. *Health Ins. Ass'n,* 23 F.3d at 414; *New York Life,* 190 F.3d at 1374. The basis of the Government's claim, however, will vary depending upon the type of insurance involved.

In some cases, Medicare will be seeking reimbursement from a primary plan that provides health insurance. The health insurer's obligations will primarily derive from the insurance agreement between the health insurer and its insured. *See, e.g., Black's Law Dictionary* 805 (defining health insurance as a contract between an insurer and its insured that obligates the insurer to pay for the costs of certain medical care or treatment that was provided to the insured). In the event that the health insurer is a group health plan, the insurance contract will be supplemented by the requirements placed on it pursuant to paragraph one of the MSPA. *Cf. Health Ins. Ass'n.,* 23 F.3d at 414 n. 2 (observing

that the MSPA imposes certain requirements on group health plans); 42 U.S.C. § 1395y(b)(1). As a result, if the medical care is a covered benefit, either under the health insurance plan or as that contract has been supplemented by the MSPA, the health insurer is "required or responsible" to pay for such care. Under these circumstances, the primary plan's responsibility rests upon contract principles and the question of tort liability is not part of the equation.

The situation is quite different, however, when the primary plan with potential responsibility for the payment of the medical care is a liability insurer. Although there are a wide variety of liability insurance coverages (i.e. products liability insurance, automobile insurance, homeowner's insurance), they all share the common characteristic of being a contract obligating the insurer to cover a loss that results from its insured's liability to a third party. *DSC Communications Corp. v. Next Level Communications,* 929 F.Supp. 239, 243 (E.D.Tex.1996); (observing that under all liability insurance policies "the insurer has agreed to indemnify the insured from liability to third persons as contrasted with coverage from losses sustained by the insured"); *see also* 1 *Couch on Insurance 3d* § 1:34 & n.8.5; *Black's Law Dictionary* 806 (defining liability insurance as "[a]n agreement to cover a loss resulting from one's liability to a third party").

A liability insurer, therefore, will not become obligated to pay for a third party's injuries unless or until its insured is found liable for causing such injuries. *See* 7 *Couch on Insurance 3d* § 103:14 (To trigger a liability insurer's liability to a third party, one "requirement is that the insured be legally liable for the third party's claim.... The term 'legal liability,' as used in a policy of insurance, means a liability such as a court of competent jurisdiction will recognize and enforce between the parties."); *see also* 43 *Am. Jur. 2d,* Insurance, § 712 (noting that "coverage [ ]under

[a liability insurance policy] attaches when liability attaches").

Because the insured normally does not have a contractual relationship with the injured third party, the basis of the insured's liability must come from a source other than contract law. That source is obviously tort law. *See* 74 *Am. Jur. 2d,* Torts § 1 ("A tort is sometimes defined as a wrong independent of contract, or as a breach of duty which the law, as distinguished from a mere contract, has imposed. To the same general effect, it has been said that the distinguishing feature of torts as applied to legal actions is that they never arise ex contractu."). Accordingly, the injured third party must first prevail upon a tort action against the insured. Once this has been accomplished, and assuming that the insured's liability falls within the stated policy coverage, the liability insurer will be responsible for the payment of such liability.

There is nothing in the MSPA that suggests Congress intended to supplant these basic principles of insurance, contract and tort law when it enacted the statute. A fair and logical reading of the statute, therefore, dictates that a liability insurer will be required or responsible to reimburse the Government for a Medicare payment only after it is established that such medical care was necessitated by the commission of a tort against the Medicare beneficiary by the insured. Thus, the Court rejects the Government's contention that its claim is not founded on tort law.

### b. *Agreement to Settle Is Not Equivalent to Admission of Liability*

█ Undoubtedly recognizing the preposterous nature of its "no-tort-required" theory, the Government has suggested an alternative interpretation of "required or responsible" that is likewise intended to eliminate its obligation to establish tort liability. It suggests that a settlement between the liability insurer and the Medicare beneficiary is the legal equivalent of an admission by the insurer that its in-

sured committed a tort against the beneficiary and that this tort caused the injuries paid for by Medicare. Because the Debtor's confirmed plan of reorganization contains a settlement offer to breast implant claimants, some of whom are Medicare beneficiaries, the Government reasons that the Debtor has acknowledged that it is required or responsible for the Medicare payments in question. *See, e.g., U.S. Opposition to Objection to Evidence* at 8 ("The Joint Plan of Reorganization itself[, which contains the Debtor's settlement offer to the breast implant claimants,] provides evidence that Dow Corning can reasonably be expected to make payment to Medicare beneficiaries who are Dow Corning implant recipients for the costs of their medical care."); *Transcript,* February 5, 1998 at 92 (counsel for the United States stating: "If there has already been a settlement [in connection with an MSPA-based claim], we do not need to re-establish a liability."). For the reasons stated below, this alternative theory is equally unavailing and is rejected.

There are a number of cases where the Government was reimbursed from the proceeds of a settlement entered into between the Medicare beneficiary and the tortfeasor's liability insurer. *Cox v. Shalala,* 112 F.3d 151 (4th Cir.1997); *Zinman v. Shalala,* 67 F.3d 841 (9th Cir.1995); *Waters v. Farmers Texas County Mut. Ins. Co.,* 9 F.3d 397 (5th Cir.1993); *United States v. Sosnowski,* 822 F.Supp. 570 (W.D.Wis. 1993). Each of these cases involved a contest between the Government and the Medicare beneficiary over their respective rights to settlement proceeds already in the possession of the beneficiary. The liability insurer was not a party to the proceeding. There was no dispute over whether the medical care paid for by Medicare was necessitated by the tortious behavior of the insured. There was no dispute over whether the settlement proceeds were, at least in part, intended to compensate the beneficiary for those same injuries. Thus, it is not surprising that these courts concluded that the Govern-

ment was entitled to at least some portion of the settlement proceeds. But these cases do not stand for the proposition that an insurer's agreement to settle with a Medicare beneficiary equates to an admission that its insured is liable in tort for purposes of a prospective lawsuit by the Government.

■ Moreover, it is a well established rule of law that "[w]hen a person against whom a claim is brought makes a settlement with the claimant, such person does not thereby acknowledge liability." *Romstadt v. Allstate Ins. Co.,* 59 F.3d 608, 615 (6th Cir.1995). This rule is a simple recognition of the fact that a defendant may settle for any number of reasons which have nothing to do with actual tort liability. *See, e.g., Tyler v. Corner Constr. Corp.,* 167 F.3d 1202, 1206 (8th Cir.1999) (observing that it is not uncommon for a defendant to settle a lawsuit which it considers frivolous in order to avoid the costs of litigation); *Caldwell v. Enyeart,* 72 F.3d 129, No. 94–1406, 1995 WL 807110, at *6 (6th Cir.1995) (observing that "parties who believe that they are not culpable, may nonetheless settle for reasons unrelated to liability, such as the avoidance of adverse publicity, a diminution of employee morale, the costs of litigation, or a loss of productivity associated with prolonged litigation"). This rule, in fact, has been codified in Federal Rule of Evidence 408 which expressly bars using evidence of a settlement to prove liability. FRE 408 ("Evidence of ... furnishing ... a valuable consideration in compromising ... a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount."); *Orth v. Emerson Elec. Co., White–Rodgers Div.,* 980 F.2d 632, 639 (10th Cir.1992). Congress, if it had been so inclined, presumably could have created an exception to this rule. But the MSPA is devoid of language suggesting that Congress meant to do any such thing. And common sense dictates that if Congress had intended for the MSPA to so signifi-

cantly curtail the rights of liability insurers and to override a well-established rule of law as well as a Federal Rule of Evidence, it would have done so using clear and unequivocal language. *Cf. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* — U.S. ——, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000) (observing that if Congress had intended for 11 U.S.C. § 506(c) to afford entities other than the trustee a right of recovery it would have said so). Accordingly, the Debtor's tentative offer to settle with breast implant claimants has no bearing on whether it will be found liable in tort with respect to the Government's claims.

#### c. *MSPA Is a "Direct Action" Statute*

 The "common law rule barring direct tort actions against liability insurers until after judgment is obtained against their insured tortfeasors" is still widely recognized. *United States v. Farm Bureau Ins. Co.,* 527 F.2d 564, 566 (8th Cir. 1976); *see also, e.g., Canavan v. Lovett, Schefrin and Harnett,* 745 A.2d 173, 174–75 (R.I.2000). But, of course, exceptions to this common law prohibition can be, and sometimes are, created by statute. *See, e.g.,* R.I. Gen. Laws § 27–7–2 (1999) (permitting injured party to bring lawsuit directly against liability insurer in certain specified situations); La.Rev.Stat. § 22:655 (providing injured persons with a direct right of action against tortfeasor's liability insurer). And it is apparent that this is just what Congress intended when it provided the Government with a right to recover directly from a liability insurer, but not its insured.

#### d. *Government Has a Single Claim That Is Both Independent and Subrogatory*

 Like the MCRA, the MSPA provides the Government with an independent right to bring a direct claim against a liability insurer that is potentially "required or responsible" for the Medicare payment in question. And when the defendant is a liability insurer the claim will be founded upon tort law and the tort in question will be the one allegedly committed by the insured against the Medicare beneficiary. To prevail, the Government must step into the shoes of the Medicare beneficiary and establish the tort. If the beneficiary were to initiate the action, it would be governed by the tort law of the applicable state law. Because the Government's claim will be premised upon this same tort, it too will be governed by the tort law of the applicable state. In addition, while the MSPA is designed to protect the financial integrity of the Medicare system, the flip side of this policy objective is to prevent the unjust enrichment of the tortfeasor or its liability insurer at the expense of the Government.

These characteristics suggest that an MSPA-based claim is one of subrogation. The MSPA itself buttresses this conclusion for it expressly states that the Government's right of recovery "shall be subrogated ... to any right" that an individual (i.e. the Medicare beneficiary) has to payment of the medical care by a liability insurer. 42 U.S.C. § 1395y(b)(2)(B)(iii). *See Health Ins. Ass'n,* 23 F.3d at 417–18; *Denekas v. Shalala,* 943 F.Supp. 1073, 1080 (S.D.Iowa 1996); *Estate of Foster,* 926 F.Supp. at 855; *United States v. Geier,* 816 F.Supp. 1332, 1337 (W.D.Wis.1993) (all cases holding or implying that the MSPA grants the United States but one claim and that it is subrogatory in character).

But, just as it did with the MCRA, the Government argues that the MSPA furnishes it with two distinct claims, one independent and the other subrogatory. *U.S. Opposition to Motion* at 51 n.31. And there is case law that initially appears to support the Government's contention. *Cox,* 112 F.3d at 154; *Zinman,* 67 F.3d at 845; *Waters,* 9 F.3d at 400–01; *United States v. Travelers Ins. Co.,* 815 F.Supp. 521, 523 (D.Conn.1992); *Provident Life and Accident Ins. Co. v. United States,* 740 F.Supp. 492, 501 (E.D.Tenn.1990); *BCBS*

*of Michigan,* 726 F.Supp. at 1522. When closely scrutinized, however, these cases either do not stand for this proposition or are not persuasive.

In *Cox,* the issue was whether the Government was entitled to a share of the proceeds from a settlement entered into between the Medicare beneficiary and the liability insurer. *Cox,* 112 F.3d at 153–54. The court's statement that the Government had a direct right of action against the entity responsible for making the primary payment and, "in the alternative," a right of subrogation against "an individual or entity which has received a payment from the responsible party" was mere dictum. Because the Government was not pursuing a direct claim against the insurer, it was not necessary for the court to address the nature of such an action. Had the Government been pursuing an action against the insurer, the Government would likely have been required to prove that the beneficiary was a tort victim of the insured and that the medical care paid for by the Government was necessitated by that tort.

But more importantly, it is clear that the court's comments were not intended to be a definitive statement of the Government's rights under the MSPA. The court simply paraphrased §§ 1395y(b)(2)(B)(ii) and (iii), making no attempt to analyze their meaning. That the court was not focused on the scope and meaning of the Government's subrogation rights is amply demonstrated by the fact that its paraphrase of § 1395y(b)(2)(B)(iii) inaccurately stated that the Government is subrogated only to the rights of entities that have received payment from the responsible party. *Id.* Subrogation, however, is not dependent upon the subrogor receiving payment from the responsible party. To the contrary, the subrogee, which has paid for an obligation owing to the subrogor, will typically be suing the responsible party directly. Furthermore, it is for the latter scenario that the MSPA provides. It states that "[t]he United States shall be subrogated ... to any right ... of an individual ... to

payment." 42 U.S.C. § 1395y(b)(2)(B)(iii). Thus, there is no requirement that the entity to whose rights the Government is subrogated has actually received payment from the responsible party.

Furthermore, *Cox* involved a Medicare beneficiary who had been injured in an automobile accident. After Medicare paid for approximately $180,000 in medical care, the beneficiary reached an $800,000 settlement with the negligent party's automobile insurer. *Id.* at 153. In the ensuing declaratory action the court held that the Government was entitled to be reimbursed for its expenditures out of the insurance proceeds. *Id.* at 154. Based upon the court's view that the Government is subrogated to the rights of an entity which receives payment from the responsible party, it would appear that it believed the Government's right to obtain reimbursement from the insurance proceeds was one of subrogation. For these reasons, in our view, *Cox* does not support the Government's argument that it has two distinct types of claims.

The Fifth Circuit's decision in *Waters* is similarly unhelpful to the Government. In that case, the Government paid for medical care furnished to a Medicare beneficiary as a result of an automobile accident. *Waters,* 9 F.3d at 398. In an interpleader action between the Government and the other individuals injured in the accident, the Government asserted that its rights to the insurance proceeds were paramount to all others. *Id.* at 399–400. It argued that there were two separate theories of recovery granting it the priority position: an independent statutory right under § 1395y(b)(2)(B)(ii); and a separate subrogation right under § 1395y(b)(2)(B)(iii). Without explicitly disagreeing with this contention, the court nevertheless limited the Government to subrogation, saying: "[n]o matter what theory is pursued ... *the government stands exactly in [the Medicare beneficiary's] shoes when recovering from the available insurance funds.*" *Id.* at 401 (emphasis added).

*Travelers* and *Provident* are also unavailing to the Government. These cases shared two issues in common: whether the Government has an independent cause of action under the MSPA that is separate from its subrogation rights; and whether the Government was entitled to seek reimbursement from a third party who was administering the self-insured employer group health plan and was not an actual party to the health insurance contract.

Though not explicitly stated by either court, the significance of the first issue stemmed from the fact that Medicare beneficiaries, not having contractual rights against the third-party administrators, did not have the right to bring suit against them. *Cf. Provident*, 740 F.Supp. at 501. Therefore, if the Government were merely subrogated to the rights of the Medicare beneficiaries, then the Government, likewise, would be unable to sue the third-party administrators directly. Both courts nominally accepted the Government's contention that it had an independent right of recovery as well as a subrogation right of recovery under the statute. As will be explained, however, their reasoning was not persuasive.

The court in *Provident*, after directly quoting the relevant provisions, stated that the "plain language" of the MSPA provides the Government with a right "to recover ... overpayment [from] ... any entity ... responsible for payment ... *or ... [to] pursue any rights it may have by way of subrogation.*" *Id.* The court's plain language interpretation, however, neglected to account for some of the statute's plain language—the phrase "shall be subrogated." The court went on to reason, as did the court in *Travelers*, that "[t]o read the statute as solely providing the Government with a right of subrogation would give effect only to the sentence dealing with the right of subrogation." *Id.; Travelers*, 815 F.Supp. at 523.

Both of these courts appear to have been laboring under the misconception that a subrogation claim cannot also be an independent claim. But as explained *supra* Part V.A.2, a subrogation claim, by its nature, is an independent claim belonging solely to the subrogee. In addition, both courts obviously misunderstood the separate and important functions served by the relevant MSPA provisions. Section 1395y(b)(2)(B)(ii) identifies the entity against whom the Government may pursue recovery under the MSPA—the "primary plan." And in so doing, the statute affords the Government with a direct right of action against the insurer that would not otherwise be available under the law. *See supra* Part V.B.2.c (The MSPA is a "direct action" statute which overrides the common law rule prohibiting lawsuits against insurers). Section 1395y(b)(2)(B)(iii) then explains how the Government can enforce this direct, independent right of action against the insurer—by standing in the shoes of the Medicare beneficiary. The two provisions work together in a clear and logical manner and no part of either provision renders any part of the other superfluous.

With respect to the second issue, both courts held that the Government does not have a claim against an entity acting solely as a third-party administrator for the group health plan. They reasoned that the MSPA provides the Government with a right of recovery only against the entity with ultimate responsibility for payment of the medical care. And that entity, the courts held, is the insurer and not the third-party administrator. *Travelers*, 815 F.Supp. at 523–24; *Provident*, 740 F.Supp. at 504. The reason that the insurer is charged with such responsibility is because of its obligations under the health insurance contract. By necessity then, the Government's right of recovery is dependent upon the health insurance agreement. If the health insurer is obligated to provide coverage under the contract, it will be responsible for payment of the medical care. But if the medical care in question is not covered, there will be no legal basis for allowing the Government to obtain re-

imbursement from the insurer.[25] In other words, for the Government to establish that it is entitled to reimbursement under the MSPA, it must step into the shoes of the insured and enforce her contractual rights. Therefore, and regardless of whether these courts were aware of the fact, their holdings with respect to the rights of third-party administrators demonstrate that the Government's right of recovery is indeed one of subrogation.

In *BCBS of Michigan*, the court stated that "[t]he right of the United States to recover for a breach of [the MSP] provisions is granted by statute. It is an independent right of recovery ... [that is] separate and distinct from a right of subrogation which arises out of a contractual relationship." *BCBS of Michigan*, 726 F.Supp. at 1522. If not read carefully, this statement could be misconstrued as standing for the proposition that the Government has two separate rights of recovery under the MSPA. *See U.S. Opposition to Motion* at 51 n.31. When placed in context, however, it does not support this contention.

The case involved the Government's attempt to recover Medicare payments for medical services that allegedly should have been paid for by Blue Cross pursuant to health insurance policies which it had issued. *BCBS of Michigan*, 726 F.Supp. at 1518. In its defense, Blue Cross noted that the insurance agreements contained provisions that limited the time within which plan participants could file suit to recover plan benefits. *Id.* at 1522. Blue Cross then reasoned that, because the Government was subrogated to the plan participants' rights under the policies pursuant to § 1395y(b)(2)(B)(iii), it should be subject to the same contractual limitations period. The quotation in question merely states the obvious: that the Government's

MSPA rights are based on statutory subrogation, not contractual subrogation. And, as explained *infra* at pp. 350–51, the Government is never barred by a limitations period unless Congress says otherwise. Read properly, then, the court's statement merely stands for the indubitable proposition that the MSPA provides the Government with an independent statutory right of recovery. It does not support the contention that the Government possesses an independent right of recovery under the statute that is separate from its statutorily-created subrogation right.

In addition, some parts of *BCBS of Michigan* strongly indicate that the court was of the view that the MSPA provides the Government with a single right of recovery that is both independent and subrogatory. *BCBS of Michigan*, 726 F.Supp. at 1522. The court relied on *York*, 398 F.2d at 584, wherein the Sixth Circuit held that the Government's MCRA-based claim was both independent and subrogatory, suggesting that the court believed the MSPA and the MCRA are parallel in this respect. *See, e.g., Health Ins. Ass'n*, 23 F.3d at 419 (recognizing that the MCRA is "a somewhat parallel statute" to the MSPA). In addition, the court held that Blue Cross was not subject to suit under the MSPA while acting in the capacity of a third-party administrator. It reasoned that a third-party administrator is not the insurer that is a party to the health insurance agreement and is, therefore, not responsible to pay for claims made against the policy. *BCBS of Michigan*, 726 F.Supp. at 1521. This, too, indicates that the court was cognizant of the subrogatory nature of the Government's MSPA-based claim.

**25.** As noted *supra* pp. 339–40, if a group health plan does not cover the types of medical care set forth in § 1395y(b)(1), the MSPA serves to extend the health insurance policy to include such coverage. *Health Ins. Ass'n*, 23 F.3d at 414 n. 2 (observing that the MSPA can

"work[] to extend the plan's coverage beyond its own terms"). The extended coverage becomes part of the insurance contract that defines the coverage to which the insured is entitled. And it is to these rights which the Government will be subrogated.

In *Zinman* a nationwide class of Medicare beneficiaries obtained a settlement intended to cover a broad range of injuries, some of which were injuries that Medicare had paid to treat. *Zinman*, 67 F.3d at 842. But because the settlement was for an amount less than their total damages, the beneficiaries asserted that the Government's reimbursement should be reduced *pro rata* in relation to the non-Medicare damages. *Id.* They argued that the Government's right to the proceeds was one of subrogation pursuant to § 1395y(b)(2)(B)(iii). And because subrogation is an equitable remedy, the equitable principle of apportionment should also apply. *Id.* at 844. The court rejected this argument, stating that "[t]he MSP legislation does not confine [the Government's] right of reimbursement to its right of subrogation. The statute grants [the Government] an independent right of recovery against any entity that is responsible for payment ... [that] is separate and distinct from [its] right of subrogation...." *Id.* at 844–45. Accordingly, it held that the Government's independent claim was not limited by the equitable principle of apportionment. Its reasoning, however, was flawed. In concluding that the statute provides the Government with an independent right of recovery that is separate from its subrogation right, the court did no more than adopt the erroneous reasoning of *Provident* and *Travelers*. *Zinman*, 67 F.3d at 845 (citing *Travelers*, 815 F.Supp. at 523; and *Provident*, 740 F.Supp. at 501). For the same reasons that these cases are unpersuasive, so is *Zinman*.

Of significance also is that the above cases did not involve situations where the primary plan's liability was in dispute. Only in these situations will the meaning of a purely independent MSPA-based claim become clear. For only then will the Government be required to identify and prove a specific cause of action that would justify imposing liability upon the primary plan. And of course, if there is no basis for imposing liability upon a primary plan, there will be no basis for obtaining reimbursement from a Medicare beneficiary or other entity that has received payment from the primary plan.

The MSPA clearly grants the Government a statutory right of recovery, but it does not provide the Government with a specific cause of action let alone set forth its elements. The elements of the Government's cause of action must, therefore, be found in some other source of law. *See supra* Part V.B.2.a. (explaining that an MSPA-based claim will be founded upon either contract or tort law). This, then, begs the question: If the Government has an independent claim separate from its subrogation claim, what will its independent cause of action be? An independent contract-based claim against a health insurer would fail for the Government and the insurer are not parties to a contract. An independent tort-based claim against a liability insurer would fail for the Government is not the victim of the tort allegedly committed by the insured. There is simply no cause of action that would enable the Government to successfully pursue an independent claim against a primary plan. In short, a primary plan's potential liability flows entirely from its obligations to the Medicare beneficiary. The fact that those obligations may have been extended by the existence of the MSPA is irrelevant. Logic, common sense, and the plain language of the statute lead to the ineluctable conclusion that an MSPA-based claim is a single claim that is both independent and subrogatory. No other construction of the MSPA is plausible.[26]

The preceding analysis demonstrates that when liability is in dispute, the MSPA essentially mirrors the MCRA. *Cf. Health Ins. Ass'n*, 23 F.3d at 419 (observing that

---

**26.** The Government's militant insistence that it has an independent claim separate from its subrogation claim is somewhat mystifying. For as shown above, it is the subrogatory character of the Government's MSPA-based claim that breathes life into its independent right of recovery.

the MSPA and the MCRA are "somewhat parallel"). While no reported case involved a dispute by the defendant-insurer about whether it indeed provided health insurance to the federal beneficiary or liability insurance to the alleged tortfeasor, it is reasonable to conclude that, like the MCRA, the Government's MSPA-based claim is governed by the substantive law, be it contract or tort, of the applicable state.[27]

■ There is an additional similarity with the Government's MCRA-based claim. The Government has not identified which states' substantive tort laws govern its MSPA-based claim against the Debtor. But as with the Government's MCRA-based claims, black letter products liability law requires the United States to demonstrate that one of the Debtor's products was involved in the treatment paid for by Medicare and that a defect in that product was the proximate cause of an injury which necessitated such treatment.

### 3. *Limitation on Government's Ability to Recover Under the MSPA*

In addition to proving the elements discussed above, the Government must also establish that, with respect to the Medicare payment in question, the party against whom it seeks recovery—Dow Corning—is the primary payer and that Medicare is the secondary payer within the meaning of the MSPA.

Recall that when an eligible federal beneficiary has no other insurance coverage, Medicare is the primary payer and has sole responsibility to pay for that individual's medical care. But where other insurance coverage is available, the MSPA generally strives to make Medicare the secondary payer. It does this by prohibit-

ing Medicare from making payments in the following situations:

(2) Medicare secondary payer

(A) In general—Payment under this subchapter may not be made [by Medicare] . . . with respect to any item or service to the extent that—

(i) payment has been made, or can reasonably be expected to be made, with respect to the item or service [by a group health plan or large group health plan], or

(ii) payment has been made or can reasonably be expected to be made promptly (as determined in accordance with regulations) under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

42 U.S.C. § 1395y(b)(2)(A)(i) & (ii).

Importantly, this prohibition against Medicare paying for medical care that is covered by paragraph 2(A)(i) or 2(A)(ii) is qualified by paragraph 2(B)(i). *See* 42 U.S.C. § 1395y(b)(2)(B)(i). Paragraph 2(B)(i) provides that in the event Medicare does make such a payment, it is "conditioned on reimbursement to the appropriate [Medicare] Trust Fund" from the entity that has primary responsibility for such payment under paragraph 2(A)(i) or 2(A)(ii). *Id.; see also Health Ins. Ass'n*, 23 F.3d at 419 (observing that paragraph "2(B)(i) provides that any Medicare payment is 'conditioned on reimbursement' if it is a payment . . . with respect to an item of service to which [ ]paragraph 2(A) applies"). Once Medicare has paid for medical care covered by paragraph 2(A)(i) or 2(A)(ii), thereby rendering such payment conditional under 2(B)(i), it acquires secondary payer status. The United States

---

27. There is one qualification to our conclusion that state law will govern a claim asserted by the Government under the MSPA. If a "group health plan" provides coverage to an eligible beneficiary, paragraph one of the MSPA mandates that the insurer pay for cer-

tain types of medical care even if the insurance policy does not list such care as a covered item. 42 U.S.C. § 1395y(b)(1). In this sense, the MSPA can serve to supplement an insurance policy issued by a group health insurer.

then has an independent right of recovery with respect to such payment under paragraph 2(B)(ii). 42 U.S.C. § 1395y(b)(2)(B)(ii); *see also Health Ins. Ass'n,* 23 F.3d at 419.

Of course the opposite also holds true. If a group health plan has not paid and cannot reasonably be expected to pay for certain health care, paragraph 2(A)(i) will not apply. *See id.* at 419. Paragraph 2(A)(ii) will not apply if one of the entities listed in that paragraph has not paid and cannot reasonably be expected to *promptly* pay for certain health care. *Id.* HCFA regulations provide that " 'promptly', when used in connection with third party payments, except . . . for payments by liability insurers, means payment within 120 days after receipt of the claim." 42 C.F.R. § 411.21. As applied to liability insurers, the term "means payment within 120 days after the earlier of . . . (1)[t]he date a claim is filed with an insurer . . . [; or] (2)[t]he date the service was furnished. . . ." 42 C.F.R. § 411.50. And when Medicare pays for an item or service to which neither 2(A)(i) nor 2(A)(ii) apply, such payment is not conditional and is not subject to reimbursement under paragraph 2(B)(i). As a result, Medicare would not acquire secondary payer status with respect to such payment and its putative authority to initiate a recovery action under 2(B)(ii) would not arise.[28]

Under the facts of this case, the Government will acquire secondary payer status with respect to those Medicare payments for which it can establish that paragraph 2(A)(ii) applies. 42 U.S.C. § 1395y(b)(2)(A)(ii) (pertaining to medical care for which a liability insurer, including an entity that is self-insured, has already paid or can reasonably be expected to be paid promptly).[29]

28. The United States' right to initiate recovery arises at the time it learns that a third party paid or could have paid in accordance with paragraph 2(A)(i) or 2(A)(ii). *See* 42 U.S.C. § 1995y(b)(2)(B)(i) (providing that a Medicare payment to which paragraph 2(A)(i) or 2(A)(ii) applies is conditioned on reimbursement "when notice or other information is received that payment for such item or service has been or could be made under [paragraph 2(A) ]."); 42 C.F.R. § 411.24(b) ("HCFA may initiate recovery as soon as it learns that payment has been made or could be made under workers' compensation, any liability or no-fault insurance, or an employer group health plan."). And it is conceivable that a considerable length of time may pass before the Government acquires such knowledge. However, this does not negate the fact that before the United States can recover in the context of paragraph 2(B)(ii), it must establish that when the Medicare payment was made the third party had already paid for such medical care or could "reasonably be expected to . . . [do so] promptly." 42 U.S.C. § 1995y(b)(2)(A)(ii).

29. Unless it can show that the Debtor is a self-insured liability insurer that had already paid for the medical care in question (through settlement or otherwise) at the time the Medicare payment was made, establishing this element will be no easy task for the Government. To do so the Government will have to show that when it paid for the medical care there was a reasonable expectation that the Debtor would pay for such care promptly. Prompt payment, as noted, is one made within 120 days of whichever date is earlier: the date the medical care was provided to the Medicare beneficiary or the date a claim is filed with the insurer. According to the Government, the medical care was provided on various dates between 1991 and 1995. *See U.S. Ex. 1: First Decl. of Vriezen* at 8–9; *Movants' Ex. I: Decl. of Ruiz* at 11. Complex products liability actions can take an inordinate amount of time to resolve and this case is no exception. From the onset of the breast implant litigation and throughout these bankruptcy proceedings, the Debtor has vigorously contested its liability on such claims. And to date, over five years after filing its bankruptcy petition, (with virtually no exceptions) the Debtor has not made any payments to breast implant claimants. Thus, it would seem to be folly for the Government to argue that, when it made the Medicare payments in question, there was a reasonable expectation that the Debtor would promptly pay for such medical care. *Cf. Evanston Hospital v. Hauck,* 1 F.3d 540, 544 (7th Cir.1993) ("[A] tort judgment five years in the future can in no sense be considered the kind of certain, prompt third-party payment Congress had in mind when it wrote the Medicare statute."); *see also Transcript,* August 6, 1998, at 219–20 (counsel for United States—"[I]f a person had an implant and she had autoimmune disease in 1985 and there was not much in the press even at that point alleging a connection[,] . . . how are we to

Summarizing the above analysis, to recover payment under the MSPA the Government must, at a minimum: 1) identify the beneficiary to whom the item or service was provided; 2) identify the item or service furnished to the beneficiary and the amount of the payment made by the Government with respect to such item or service; 3) establish that the party against whom recovery is sought is a "primary plan" or received payment from a "primary plan;" 4) prove that the third party against whom it seeks recovery is required or responsible to make payment with respect to the item or service provided; and 5) demonstrate that Medicare is the secondary payer with respect to the payment of such item or service.

## VI. Summary Judgment

In their motion for summary judgment, the Movants state four grounds for relief. They contend that "[t]he claim filed by HCFA is improper and filed by the wrong party; [and that] the true creditor[,] ... [which] never filed a claim[,] ... is barred as a matter of law [from doing so]." *Summary Judgment Motion* at 9. They also assert that substantial numbers of the Government's claims are subject to disallowance on statutes of limitations grounds. *Brief in Support of Objection to Evidence* at 20–24. But in any event, they maintain that the United States' claims "are defective, incomplete and otherwise incapable of being proven as a matter of law." *Summary Judgment Motion* at 9. The Movants further contend that "[t]he United States['] Claims that are not disallowed, if any, should be subordinated as a matter of law pursuant to [§ 509(c) of] the Bankruptcy Code[ ]...." *Id.* at 10.

## A. Standing of HCFA to File Proof of Claim

The first ground for relief can be disposed of rather quickly. The Movants maintain that the proof of claim filed by HCFA was actually filed on behalf of the wrong party because the reimbursement right afforded under the MSPA does not run to HCFA. To support this argument they rely on a provision of the MSPA which states that reimbursement is to be made " 'to the appropriate Trust Fund established by [the statute].' " *Brief in Support of Summary Judgment Motion* at 16 (quoting 42 U.S.C. § 1395y(b)(2)(B)). Since the "appropriate Trust Fund" is the only entity entitled to receive reimbursement under the MSPA, the Movants argue that it, and not HCFA, is the party with standing to seek reimbursement from the Debtor. The cases cited by the Movants in support of this argument discuss the effect that the source of government funding (i.e. general revenue fund versus special fund such as social security fund) has on the "collateral source" rule. *Id.* (citing *Berg v. United States,* 806 F.2d 978, 985–86 (10th Cir.1986)) and *Siverson v. United States,* 710 F.2d 557, 560 (9th Cir.1983). However, these cases do not stand for the proposition that the United States lacks standing to bring suit on behalf of a trust fund created by the Government, operated by the Government and funded by taxpayer dollars.

The fact is, the MSPA expressly provides that "the United States may bring an action" for recovery thereunder. 42 U.S.C. § 1395y(b)(2)(B)(ii). Moreover, the Medicare program is administered by the Secretary of Health and Human Services. And the Secretary delegated the responsi-

know now in 1998 that we should have flagged a record for someone we treated for lupus in 1985?"); *U.S. Opposition to Motion* at 4 (acknowledging that when it "made payments on behalf of [Medicare] beneficiaries ..., [it] did so when it was unknown that manufacturers of breast implants such as Dow Corning might be held liable in tort for the costs of such care"); *U.S. Ex. 15: Second*

*Decl. of Vriezen* at 3 ("HCFA has no information identifying the women who made claims against Dow Corning and who have been, or reasonably expect to be, compensated by Dow Corning for claims related to their breast implants."). The Movants did not specifically challenge this aspect of the Government's cause of action in their motion for summary judgment and so the Court need not decide it.

bility for promulgating regulations under the MSPA to HCFA. 42 U.S.C. § 1395hh(a)(1); 42 C.F.R. § 411.24(b) ("HCFA may initiate recovery as soon as it learns that payment has been made or could be made under worker's compensation, any liability or no-fault insurance, or an employer group health plan."). Therefore, the HCFA claim was filed by the appropriate entity.

## B. Statute of Limitations

■■■■ As explained, the Government's rights under the MCRA and the MSPA are subrogated to the state law rights of the federal beneficiary. Nevertheless, the state statute of limitations that would otherwise be applicable to the beneficiary's claim will generally have no impact on the Government's claim. This result derives from the fact that the Government represents the collective rights of its citizens. And because these rights belong to the public as a whole, they are not subject to forfeiture due to the carelessness or complacency of a governmental official. *See, e.g., United States v. Thompson*, 98 U.S. 486, 489, 25 L.Ed. 194 (1878). Therefore, claims asserted by the United States are ordinarily immune from any period of limitation unless Congress manifests an intent to the contrary. *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940); *Board of Comm'rs of Jackson County v. United States*, 308 U.S. 343, 350–51, 60 S.Ct. 285, 84 L.Ed. 313 (1939); *E.I. Du Pont De Nemours & Co. v. Davis*, 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924); *United States v. Nashville, Chattanooga & St. Louis Ry. Co.*, 118 U.S. 120, 125, 6 S.Ct. 1006, 30 L.Ed. 81 (1886); *Thompson*, 98 U.S. at 488–90.

■■■■ This rule also applies to an independent claim of the United States that is derivative of the rights of another party. *Summerlin*, 310 U.S. at 416, 60 S.Ct. 1019 ("We are of the opinion that the fact that the claim was acquired by the United States [through assignment] . . .

does not take the case out of this rule."); *Nashville, Chattanooga & St. Louis Ry. Co.*, 118 U.S. at 125, 6 S.Ct. 1006 (stating that when the Government became the owner of certain negotiable paper, "[it] took] such paper subject to all the equities [then] existing against the person from whom [it] . . . acquire[d] . . . title," except that its claim could not be barred by the state limitations period). Accordingly, tort claims asserted by the Government under the MCRA and the MSPA will receive the benefit of this rule in spite of the fact that such claims are subrogatory in character. *See United States v. Gera*, 409 F.2d 117, 120–21 (3d Cir.1969).

■■■ The one exception to this rule is that if the limitations period otherwise applicable to the subrogor's or assignor's claim has already expired at the time it is acquired by the United States, then the claim is acquired subject to this "pre-existing infirmity" and will not be revived by its transfer to the Government. *U.S. v. California*, 507 U.S. at 758–59, 113 S.Ct. 1784; *Guaranty Trust Co. v. United States*, 304 U.S. 126, 142, 58 S.Ct. 785, 82 L.Ed. 1224 (1938); *Nashville, Chattanooga & St. Louis Ry.*, 118 U.S. at 125–26, 6 S.Ct. 1006; *United States v. Thornburg*, 82 F.3d 886, 889–90 (9th Cir.1996); *FDIC v. Wheat*, 970 F.2d 124, 128 n. 7 (5th Cir. 1992).

Therefore, if the federal beneficiary's claim against the Debtor was time barred on the date that the Government, as subrogee, asserted its claim against the Debtor, the Government's claim will likewise be barred. But because this is a bankruptcy proceeding, the question of whether a pre-existing infirmity has affixed to one of the Government's subrogation claims will be determined as of the petition date, not the date that the Government filed its proofs of claim. *See* 11 U.S.C. § 362(a)(1). If there is no pre-existing infirmity, the Government's claims against the Debtor will be subject only to time limitations imposed by Congress. And it is uniformly recognized that Congress has enacted a statute

of limitation which is applicable to Government claims made pursuant to the MCRA and the MSPA, 28 U.S.C. § 2415. *See, e.g., Cockerham,* 768 F.2d at 787.

At issue here is whether the Government's claims against the Debtor are governed by subsection (a) or (b) of this statute. Subsection (a) provides that "every action for money damages brought by the United States ... *which is founded upon any contract* express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action first accrues...." 28 U.S.C. § 2415(a). Subsection (b) states that "every action for money damages brought by the United States ... *which is founded upon a tort* shall be barred unless the complaint is filed within three years after the right of action first accrues...." 28 U.S.C. § 2415(b).

The Movants assert that the Government's claims under both the MCRA and the MSPA are founded on tort and are, therefore, subject to the three-year period of limitation contained in § 2415(b). *Brief in Support of Objection to Evidence* at 20. Accordingly, they maintain that any Government claim arising before May 15, 1992 (three years prior to the date the Debtor filed its bankruptcy petition) is time barred.

The Government acknowledges that its claims under the MCRA are tort claims subject to § 2415(b). *Opposition to Objection to Evidence* at 21. And the Court agrees with this assessment. *See also Gera,* 409 F.2d at 120; *Card v. American Brands Corp.,* 401 F.Supp. 1186, 1188 (S.D.N.Y.1975). *Cf. Garvin,* 768 F.2d at 787 (concluding that, under the circumstances of that case, the Government's MCRA-based claim was founded in contract, not tort, thereby making the applicable statute of limitations six years).

 And logic suggests that the same result should apply to the Government's MSPA-based claims. After all, recovery on these claims will require the Govern-

ment to prove that the Debtor committed a tort against the Medicare beneficiary. But the Government disagrees. It notes that case law has uniformly held that claims arising under the MSPA are subject to the six-year period found in § 2415(a). *U.S. Opposition to Objection to Evidence* at 20 (citing *United States v. Beck,* 758 F.2d 1553, 1557 (11th Cir.1985); *Provident,* 740 F.Supp. at 505; and *BCBS of Michigan,* 726 F.Supp. at 1522). Based on these cases, the Government argues that its "right to recover is provided by federal statute and falls squarely within the purview of [§ 2415(a) ]." *Opposition to Objection to Evidence* at 20.

The fact that the Government's rights are created by statute is not a defining or even relevant factor. If it were, the United States' tort claims under the MCRA would also be subject to § 2415(a). But as the Government itself acknowledges, its MCRA-based claims are subject to § 2415(b). Moreover, the Government's argument simply ignores the crucial factor common to all of the cases that have applied a six-year limitation period to claims under the MSPA—they were contract actions.

*Beck* involved efforts by the Government to recoup excessive Medicare payments made to a physician participating in the Medicare program. Doctors and hospitals are not obligated to participate in the Medicare program; they do so by entering into a contract with the Secretary of Health and Human Services. *See, e.g.,* 42 U.S.C. §§ 1395c to 1395i-4 & 1395cc (setting forth parameters for participation in the Medicare program by hospitals and other institutional health care providers); 42 U.S.C. §§ 1395j to 1395w-4 (same for physician participation in the program); *see also Heckler v. Community Health Serv. of Crawford County, Inc.,* 467 U.S. 51, 54, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (observing that the institutional health care provider in that case had *contracted* with the Secretary to provide services under Medicare). By entering into such a

contract, a health care provider agrees to comply with the requirements of the Medicare program. *Heckler,* 467 U.S. at 64, 104 S.Ct. 2218 ("As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement."). And when a health care provider fails to comply with these requirements, it violates its contract with the Government. In *Beck,* the physician had allegedly requested and received payments in excess of what he was entitled to under the Medicare program and the Government was suing for breach of contract. Accordingly, the court applied the six-year limitation period for contract claims.

But there is another, and more fundamental, reason for which *Beck* fails to support the Government's argument. In *Beck,* the Government was suing to recover excessive payments that it had made as the primary payer of health care under the Medicare program. That is, it was not seeking to recover conditional payments made as the secondary payer of health care costs for which another insurer had primary responsibility. Thus, the case was not even governed by the MSPA and is therefore not relevant to the present matter.[30]

*Provident* and *BCBS of Michigan,* on the other hand, were MSPA cases. In both the Government paid for the costs of medical care that had been furnished to certain Medicare beneficiaries who also happened to be covered by a group health plan. *Provident,* 740 F.Supp. at 496; *BCBS of Michigan,* 726 F.Supp. at 1520. Under the MSPA, the Government is deemed the secondary payer and the group health plan the primary payer. And in both cases, the Government sued to recover its expenditures on the ground that the insurer was obligated to make such payments pursuant to the group

health insurance plan that it had issued. Because the Government was suing to enforce the health insurance contracts, its claims were contractual in nature and the courts were correct to apply § 2415(a). *Provident,* 740 F.Supp. at 505; *BCBS of Michigan,* 726 F.Supp. at 1522.

But it does not follow that § 2415(a) is applicable to all MSPA-based claims. "The application of a statutory limitation period to a particular cause of action is grounded in logic and reason." *Cockerham,* 768 F.2d at 787. In any particular case, a court must, therefore, examine whether the Government's MSPA-based claim is founded upon a tort or a contract. The determination in this case is truly elementary. As discussed previously, *supra* Part V.B.2.a, to prevail on its MSPA-based claim, the Government must prove that Dow Corning—the alleged tortfeasor—committed a tort. Clearly, the Government can point to no contractual provision binding Dow Corning to pay medical benefits to an implant recipient who also received medical benefits from the Government. Consequently, the Government's MSPA-based claim is "founded upon tort" and § 2415(b)'s three-year statute of limitations period applies.

This does not entirely resolve the statute of limitations question. For one thing, before the Debtor filed bankruptcy, it, along with other breast implant manufacturers, entered into a tolling agreement with the Government. *Ex. 3 to U.S. Opposition to Objection to Evidence* (copy of the tolling agreement). Pursuant to this tolling agreement, the Debtor agreed "not to plead any statute of limitations ... defenses to any civil claims ... filed by the United States on or before October 1, 1995, unless such defense would have been available in any action filed on or before February 3, 1995." *Id.* at 11. The United

---

**30.** Other cases identical to *Beck,* in this respect include: *United States v. Kass,* 740 F.2d 1493, 1496 (11th Cir.1984); *United States v. Diaz,* 740 F.2d 1491 (11th Cir.1984); *United States v. Pisani,* 646 F.2d 83 (3d Cir.1981);

*United States v. Upper Valley Clinic Hosp., Inc.,* 615 F.2d 302 (5th Cir.1980); *United States v. Ruegsegger,* 702 F.Supp. 438 (S.D.N.Y.1988); and *United States v. Bragg,* 493 F.Supp. 470, 474 (M.D.Fla.1980).

States somehow construes this tolling agreement to mean that the Debtor has "expressly waive[d] any statute of limitations defense it might otherwise have." *U.S. Opposition to Objection to Evidence* at 22. But this statement plainly mischaracterizes the scope of the agreement. The tolling agreement simply provides that the Debtor cannot raise a statute of limitations defense unless that defense would have been available on or before February 3, 1995.

Furthermore, the Government relies on 28 U.S.C. § 2416(c), which provides that "[f]or purposes of computing the limitations periods established in section 2415, there shall be excluded all periods during which ... facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with responsibility to act in the circumstances." 28 U.S.C. § 2416(c).

We note that the Food and Drug Administration imposed a very well publicized moratorium on the sale of silicone-gel breast implants in May of 1992. *See In re Dow Corning Corp.*, 211 B.R. 545, 551 (Bankr.E.D.Mich.1997). The FDA took this action due to concerns over the product's safety. And considering the publicity

the moratorium received, it is unimaginable that the Government was not aware of the FDA's action and the reasons that such action was taken. Consequently, it would be difficult for the Government to persuasively argue that the period of limitation on its claims did not begin to run on or before the date of the moratorium.

However, this issue has not been fully briefed by the parties nor have all of the facts relevant to the issue come before the Court. Thus, while the Court holds that the three-year statute of limitations period of § 2415(b) applies to all of the Government's MCRA and MSPA claims against the Debtor, we make no ruling at this time as to whether any portions of the Government's claims against the Debtor are actually barred by the statute of limitations.

### C. Evidence Tending to Prove Government's Claims

■ The motion for summary judgment primarily focuses on whether the Government has presented evidence sufficient to prove that a product of the Debtor's was involved in the medical treatment provided to the federal beneficiaries. *Motion* at 2; *Brief in Support of Motion* at 7; *Joint Reply in Support of Motion* at 3.[31] It

**31.** The motion for summary judgment touched upon two other elements that are essential to the Government's claims: identification of the medical care that was provided to the federal beneficiaries as well as its costs. *Motion* at 2; *Brief in Support of Motion* at 6; *Joint Reply in Support of Motion* at 3.

There is no dispute as to how the Government identified the federal beneficiaries that form the basis of its claims against the Debtor. Using certain procedure and diagnostic codes associated with surgeries of the breast, it searched computerized databases maintained by HCFA, VA, IHS and DoD. *See U.S. Opposition to Motion* at 13; *Motion* at 4. The procedure and diagnostic codes were for procedures such as removal of breast implant, removal of implant material, surgery of breast capsule, and revision of breast implant. *See, e.g., U.S. Ex. 1: First Decl. of Vriezen* at 7–8; *Movants' Ex. I: Decl. of Ruiz.* The computer search matched these procedural codes with specific federal beneficiaries who then formed the basis of the Government's claim. Except

for the 218 or so VA and IHS beneficiaries for whom the Government has produced medical files, the matching of procedural codes with federal beneficiaries is the extent of the evidence produced with respect to the medical care provided to individual federal beneficiaries. In some circumstances, such evidence may be sufficient to create a question of fact for trial. At trial, the actual medical files could then be offered to specifically identify the medical care supposedly necessitated by the Debtor's tortious behavior. In this case, however, the Government would be precluded from offering such medical files at trial since it failed to produce them during the discovery period. Thus, the Government might have difficulty trying to prove this element.

And it would appear that the Government is in much the same position with respect to being able to prove the amount of its claim. For instance, the Government's estimate of its HCFA claim appears to have been derived entirely from a computer-generated list of billing patient records. *See U.S. Exs. 6 and 15.* The original HCFA billing records that

is well established that product identification is an essential element of every products liability action, regardless of which state's law governs. *See, e.g., Lee,* 721 F.Supp. at 92; *Marshall,* 651 F.Supp. at 391; *Rutherford v. Owens–Illinois, Inc.,* 16 Cal.4th 953, 67 Cal.Rptr.2d 16, 941 P.2d 1203, 1214 (1997); *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, 1073 (1989).

As previously indicated, the Scheduling Order provided that discovery pertaining to tort causation would be deferred until further order of the Court. And of course, product identification is an element of causation in products liability cases. *See, e.g.,* 63 *Am Jur 2d,* Products Liability § 73. In a responsive pleading filed the day of the hearing on the Motion for Summary Judgment, the Government asserted that the "Motion is improper to the extent that it seeks to force the United States to prove causation at this juncture." *Opposition to Objection to Evidence* at 9–10. Though not entirely clear from this statement, it appears that the Government may be arguing, for the first time, that it should not be required at this point to present evidence pertaining to the element of product identification. But all parties clearly understood that this aspect of causation was not deferred by the Scheduling Order. Consequently, to the extent the Government is making such an assertion, it is rejected.

The Scheduling Order, which was agreed to by the parties and presented to the Court for signature, could have been drafted with more precision. Nevertheless, the deferred discovery related only to issues of product defect in general, and science-related causation issues in particular: "Discovery other than expert witnesses must be completed no later than March 5, 1999 … Discovery relevant to the issue of tort causation will be deferred until further Order of the Court. Parties can inquire as to why a claim was made, but cannot inquire as to the scientific basis of that claim until further Order of the Court." *Scheduling Order* at ¶¶ 2 and 3. The final discovery order, extending the discovery deadline to May 30, 1999, contained similar phrasing: "Discovery other than expert witnesses must be completed no later than May 30, 1999, and discovery completed no later than May 30, 1999, and discovery relevant to the issues of tort causation will still be deferred until further order of the Court." The parties' stipulation to the entry of the latter order discloses the intendment of the order. It says: "The parties stipulate that the Scheduling Order for Claim Objection Nos. 4–7 is revised to extend discovery, other than expert witnesses, until May 30, 1999, and the time to file dispositive motions, other than those related to tort causation issues, until June 4, 1999." This document

would likely be necessary to substantiate the amount of this claim at trial were not produced by the Government within the discovery period. The Government appears to have a similar dilemma with respect to its MCRA-based claims and its DoD claims in particular. *See Transcript,* September 2, 1999 (counsel for United States stating that there are no billing records for MCRA-based claims since the Government provided the care in question directly) *and supra* p. 321 (The Government is now precluded from producing medical files that would enable it to substantiate the medical care provided to the DoD beneficiaries.).

In short, it appears that the Government would not be capable of producing evidence sufficient to prove either of these elements at trial. For this reason alone, a strong argu-

ment could be made that granting the motion for summary judgment would be appropriate. 11 *Moore's Federal Practice,* § 56.11[1][b] at 56–89 (Summary judgment is appropriate when "[t]he movant demonstrates that evidence supporting nonmovant's claim is sham evidence, weak evidence, or evidence insufficient as a matter of law."). Nonetheless, the Court does not base its ruling on the Government's apparent inability to establish these essential elements of its claim. In part, this is because the briefs did not address these elements with sufficient specificity. But more importantly, and as will be discussed, the evidence is unequivocal that the Government is incapable of establishing that the Debtor's product was involved in the medical care provided to the federal beneficiaries.

was signed on May 6. The Movants filed their motion for summary judgment asserting the Government's inability to produce evidence that a Dow Corning product caused the federal beneficiaries the harm alleged 22 days later. Clearly the term "tort causation issues" was imprecise; what was intended—and understood—was scientific issues on whether the Debtor's products were defective. No experts were necessary on the question of whether the federal beneficiaries even received Dow Corning products.

The record demonstrates that all parties were fully cognizant of the fact that discovery pertaining to product identification was not deferred by the Scheduling Order. The order was formulated at a pre-trial hearing conducted July 16, 1998. That the Movants wanted to defer discovery on what they referred to as issues of "tort causation" was known by the Government and the Court in advance. *See [Proposed] Claim Objection No. 5 Scheduling Order* ¶ 4 ("The parties will enter into a stipulation ... that will preclude discovery relevant to the issue of tort causation until further order of the Court."). At the hearing, there was extensive discussion on the appropriate scope of the initial phase of discovery. On more than one occasion, the Movants stated that the information they were seeking during the initial phase of discovery included not only the identities of the federal beneficiaries underlying the Government's claims and the amount that the Government sought to recover on behalf of each beneficiary, but, most importantly, whether a Dow Corning product was involved in such treatment. *Transcript,* July 16, 1998 at 78–79, 99 and 104. Not once during this pre-trial hearing did the United States argue that product identification should be excluded from the initial discovery phase.

When the TCC served its discovery request on the Government, it requested evidence pertaining to product identification. *See, e.g., U.S. Ex. 29: VA Responses to Discovery Propounded by TCC,* Interrogatories 4 and 5. The Government objected to this request on the ground that it was too burdensome, but it did not argue that the discovery sought was beyond the scope of the Scheduling Order. *Id. See also U.S. Ex. 30: IHS Responses to Discovery Propounded by TCC* at 29–30; *U.S. Ex. 42: HCFA Responses to Discovery Propounded by TCC* at 25–30; *U.S. Ex. 43: DoD Responses to Discovery Propounded by TCC* at 11–14.

The Debtor also sought information relating to product identification. One of the Debtor's interrogatories requested that the Government, "[f]or each Underlying Claimant, state the facts upon which [it] rel[ies] to support [its] claim ... This explanation should also include Debtor's involvement in the implant, whether as manufacturer, distributor or supplier of a part of the product." *E.g., U.S. Ex. 46: HCFA Responses to Discovery Propounded by the Debtor* at 12. This portion of the interrogatory clearly goes to product identification. The same interrogatory goes on to ask the Government to explain "exactly what about the Debtor's conduct was tortious." *Id.* The Government objected to this interrogatory "insofar as it seeks discovery relevant to the issue of tort causation." *Id.* at 13. When viewed in the context of the Government's discovery responses to both the TCC and the Debtor, it is reasonable to conclude that this objection pertained only to the latter portion of the interrogatory, the Debtor's request for an explanation of "what about the Debtor's conduct was tortious." After all, the TCC asked for information on product identification as well, and as explained, the Government did not object to that request on the grounds that discovery on causation had been deferred.[32]

32. Why the Movants chose to serve discovery requests on the Government in the first place is somewhat of a mystery. From the outset, it appeared that the Government had no intention of mining its own records to obtain the information needed to prove its claims. In light of this, one wonders why, after objecting to the Government's claims, the Movants did

Even more telling is the fact that the Government also sought information pertaining to product identification during the discovery period. *See U.S. Ex. 36: U.S. First Set of Interrogatories and Request for Production of Documents to TCC,* Request for Production of Documents No. 2; *and U.S. Ex. 36: U.S. First Set of Interrogatories and Request for Production of Documents to Debtor,* Interrogatories No. 6 and 8. And at the August 6, 1998 hearing, the Government openly stated that, as part of the initial discovery process, it sought access to the confidential information because it believed such information to be "relevant to establishing whether or not a Dow Corning product is involved." *Transcript,* August 6, 1998 at 195; *cf. id.* at 225 ("[O]ur ability to prove an allowed claim, we believe ... will depend on our ability to show a nexus to a Dow Corning product."). In addition, nowhere in the United States' Opposition to the Motion for Summary Judgment did it argue that the issue of product identification was deferred by the Scheduling Order and, therefore, not properly before the Court.

It is abundantly obvious that all parties understood that evidence of product identification was fair game during the initial discovery phase. As a result, it was perfectly appropriate for the Movants to seek summary judgment on the basis that the Government has no evidence to show that whatever alleged harm befell a federal beneficiary was caused by a Dow Corning product. Whether the Government has satisfied the product identification element with respect to the 200 to 300 VA and IHS

beneficiaries for whom medical files were produced and the approximately 4,500 HCFA and DoD beneficiaries whose names matched with names in the confidential databases will be discussed separately in Part VI.D and E below.

As for the remainder of the Government's claims, the Movants contend that the Government has completely failed to produce any evidence regarding product identification. *Motion* at 4; *Joint Reply in Support of Motion* at 3. The record supports this assertion. *See Movants' Ex. E* (excerpt from deposition of Vriezen for HCFA) (Q: "So you don't know if even one of your claims involves a product where the material was ... manufactured by [the Debtor] or the implant was actually made by [the Debtor]? A: 'That's true.'"); *Movants' Ex. F* (excerpt from deposition of Howard for VA) (same).

According to the Government, the record demonstrates the existence of disputed issues of material fact. *U.S. Opposition to Motion* at 42–43. But at the same time, it readily admits that it has not produced any meaningful evidence pertaining to the issue of product identification. *See, e.g., id.* at 4 ("[T]he agencies did not systematically capture information concerning the identity of the manufacturer or distributor of the breast implants ... which gave rise to the medical problems treated."); *id.* at 19 ("The information necessary to prove the United States['] Claims comprehensively cannot feasibly be obtained from the federal agencies['] own records."); *id.* at 47 ("The computer databases maintained by

not simply sit back and allow the Government to sink its own boat. That said, the Government's actions throughout these proceedings have been even more puzzling. For the most part, it has absolutely refused to produce the information necessary to prove the elements of its claims. The Government should have produced the necessary information of its own volition. It should have produced such information during the discovery process. It did not. Instead, it complained that proving its claims would be too burdensome or that doing so would require it to violate the Privacy Act. So how did the Government expect to

prove these asserted claims which it valued in the millions of dollars? Were the Debtor and the Court simply expected to take the Government's contention at face value? Or is it possible that the Government never believed in its bloated claims enough to invest the resources necessary to prove them, and instead, merely hoped to be able to exact a hefty "tribute" from the Debtor through scare tactics. As counsel for the TCC stated (perhaps, but not necessarily fully in jest), this is still America and before the Government can prevail on its claims, it has to prove them. *Transcript,* September 2, 1999 at 178.

the various federal agencies in this case do not contain information identifying the maker of the implant removed or implanted.").

Given that the record is indisputably void of meaningful evidence of product identification—an essential element of the Government's claims—it would appear that the Movants are entitled to summary judgment as to the great preponderance of its claims. *Celotex,* 477 U.S. at 322–25, 106 S.Ct. 2548; *see also* 11 *Moore's Federal Practice* § 56.11[1][b], at 56–86. Nevertheless, the Government argues that the absence of proof as to implant manufacturer should not be fatal to its claim.

First, the Government suggests that it is the Movants who are primarily responsible for producing the evidence necessary to prove the Government's claim. Second, the Government asserts that even if it is required to substantiate its claim, the only reason it has been unable to do so thus far is because it has been improperly denied access to the information protected by the Confidentiality Orders. Finally, the Government seems to suggest that in mass tort situations such as this one, it should be able to prove its claim without producing beneficiary-specific evidence. Rather, it contends that it should be able to prove its claim in an aggregative fashion or through the use of market share data. For the reasons stated below, the Court rejects each of the Government's arguments.

### 1. *Movants' Responsibility to Supply Evidence Needed to Prove Government's Claims*

██ The Government suggests the odd notion that it should be excused from having to produce evidence necessary to prove its claims because this responsibility belongs to the Movants. *U.S. Opposition to Motion* at 8–9 ("[The Movants] ignore, as they have from the outset of this litigation,

the obligation placed upon them by federal law to provide the identifying facts to the agencies of the United States that provided or paid for federal medical care."); *id.* at 46 ("[U]nder the MSP statute, the burden of ensuring that appropriate payment is made to HCFA lies with [the Debtor] as a third party payer, and that obligation logically includes identifying those cases in which [one of the Debtor's] product[s] is involved in a claim."). One bristles at the thought that Congress' intent when enacting the MCRA and the MSPA was essentially to place the burden of disproving liability on the defendant. Nonetheless, this seems to be the Government's assertion.

Because the Government presented no legal authority to support the contention that the Debtor must help the Government prove its MCRA-based claim, the Court rejects it. As for the MSPA, the United States cited 42 C.F.R. § 411.24. This regulation, which applies to the recovery of conditional Medicare payments, provides: "In the case of liability insurance settlements ... [, i]f Medicare is not reimbursed as required by paragraph (h) of this section, the third party payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party." 42 C.F.R. § 411.24(i)(1).[33]

This regulation clearly puts a potentially responsible party on notice that it could be subject to double payment if appropriate arrangements are not made to reimburse the Government for a conditional Medicare payment. In this sense the regulation simply echoes the MSPA. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii) (providing that the responsible party may be subject to double damages in the event that primary payment or appropriate reimbursement is not made to Medicare). But what this regulation does not and cannot do is eliminate from the MSPA the Government's burden of establishing that a party is required or

---

**33.** Paragraph (h) simply states that "[i]f the beneficiary or other party receives a third party payment, the beneficiary or other party

must reimburse Medicare within 60 days." 42 C.F.R. § 411.24(h).

responsible for the conditional payment in the first place. 42 U.S.C. § 1395y(b)(2)(B)(ii) (providing the United States with a right of recovery only against a party that is "required or responsible" for the conditional payment). Nor is it reasonable to conclude that this regulation requires the potentially responsible party to tie its own noose. There is simply nothing in this regulation that places an affirmative duty on the potentially responsible party to furnish the Government with the evidence necessary to prove the elements of its claim.

██ The Government also asserts that the TCC itself owed the Government a duty to cooperate. It cited a number of federal regulations that do indeed create obligations to cooperate with the Government's payment recovery efforts under both the MCRA and the MSPA. But, as logic would dictate, they are obligations placed solely upon the federal beneficiary. 28 C.F.R. § 43.2 (placing certain obligations on "persons receiving care and treatment"); 42 C.F.R. § 411.23 (stating that if "HCFA takes action to recover conditional payments, the beneficiary must cooperate in the action"); 32 C.F.R. § 199.12(e)(2) (describing "[o]bligations of persons receiving treatment"); 32 C.F.R. § 537.23(a)(1)(iii) (providing that an injured party who receives care from DoD is "required to cooperate in the prosecution of all actions of the United States against the person or persons who injured him"); 32 C.F.R. § 757.18(e)(2) (same); *cf.* 32 C.F.R. § 842.120(d) (providing that when the Government intends to seek recovery of the reasonable value of medical care that was furnished to a DoD federal beneficiary, *the Government must notify the beneficiary of its intent* to do so and inform the beneficiary of his obligation to cooperate in such recovery action).

While these regulations strictly speak to the federal beneficiary's obligations, one could argue that they also impose certain obligations upon the federal beneficiary's attorney. *Cf.* 32 C.F.R. § 757.18(e)(2)

(providing that when the Government decides to seek recovery for the cost of medical care it must notify the federal beneficiary *or his attorney* of this decision and inform them of the beneficiary's obligation to cooperate). But the TCC represents the interests of the personal injury claimants that make up its constituency in a general capacity only. Neither the TCC nor its counsel is, or has ever attempted to be, the legal representative for any of its constituents on an individual basis. *Cf.* 11 U.S.C. § 1102(b)(1) (providing that creditors' committees are to be composed "of creditors" who will generally not be attorneys with legal standing to represent other creditors); 11 U.S.C. § 1103(b) (stating that an attorney who represents a creditors' committee may, in a different capacity, represent an individual constituent as long as no conflict arises out of such representation). Accordingly, we reject the Government's apparent contention that the TCC is obligated by these regulations.

### 2. *Government's Inability to Access Sealed Information*

██ The Government argues that, if it is required to establish product identification, its failure to substantiate this aspect of its claims stems from its inability to gain access to the confidential information. *U.S. Opposition to Motion* at 16–17 ("Without obtaining the names and other identifying information of [Dow Corning] implant beneficiaries in the [confidential] databases, the United States cannot feasibly determine the full extent and cost of [its claim]."); *id.* at 4 ("While information concerning an implant manufacturer or distributor may be (and has been found) as an incidental notation in a beneficiary's underlying medical treatment records, a review of these records for incidental mentions of [Dow Corning] implants is not feasible in view of the more than 15,000 federal beneficiaries identified, the number and location of medical facilities involved, and the cost and burden of retrieving and

storing massive amounts of minimally useful hard copy data.").

And the Government bitterly complains that its inability to access such information has been caused by the Movants' lack of cooperation. *Id.* at 2 ("[I]t is the [Movants] who have obstinately and intransigently withheld from the United States material, non-privileged information essential to the resolution of this case."); *id.* at 17 ("[The Movants] have refused to provide the identifying information essential to the United States' Claims informally or through discovery."); *see also id.* at 38 ("The United States' ability to produce proof in support of its claims has been hampered by this Court's decision to grant only limited relief to the United States on its motion for access to [the confidential] information . . . ."). Moreover, the Government argues that it should not bear the consequences of the Movants' recalcitrant behavior: "In the event that the Court determines the United States has failed to identify disputed facts sufficient to defeat the motion for summary judgment, the Court should deny the motion because the United States has not been given access to the proof of claim information concerning the Personal Injury Claimants which is necessary to prove the United States' claims." *Id.* at 28.

A detailed discussion of the Government's attempts to gain access to the confidential databases is provided in Part I.C and will not be reiterated here. However, we do emphasize a few of the more cogent points to be taken from that discussion. To begin with, the Movants' supposedly intransigent behavior stems from their insistence on complying with the orders of, not one, but two different courts. In turn, this Court's willingness to enter the Confidentiality Orders in this case stems in large part from our perceived obligation to respect and uphold the confidentiality order entered by Judge Pointer in connection with MDL 926 proceedings. And despite suggestions by the Court that it do so, the Government never approached Judge Pointer about obtaining relief from his order.

More importantly, however, the Government could have obtained access to the confidential information. It could have done so by making a proper evidentiary showing of its need for the information. But it never succeeded in doing so. The Government could have compiled a list of federal beneficiaries, beyond the 15,048 identified, to include any federal beneficiary who had received treatment for any illness that may have been caused by a Dow Corning breast implant. The fact that such a list likely would have been vastly broader than what it did produce should not have been a deterrent. After all, the Government simply would have had to provide this list to the Debtor which would have then cross-matched the list against the confidential databases. The result would have been a list consisting of federal beneficiaries who had filed breast implant claims against the Debtor. However, the Government chose not to do this either. Thus, the Government had ample opportunity to acquire the information that it purports to have so badly needed. It is the United States' own stubbornness that is to blame for its lack of access to this information.

And finally, the Government could have done its own homework. After all, it had over four years from the bankruptcy filing date until the hearing on the motion for summary judgment to search its own files. It also had the years prior to the Debtor's bankruptcy while the same issues were pending in the MDL 926 proceedings. A reasonable person having sufficient faith in the righteousness and value of his claims would have invested the necessary time and effort to establish his case.

### 3. *Aggregation and Market–Share Theory*

Lastly, the Government seems to contend that evidence of product identification with respect to individual federal beneficiaries is not a necessary element of its

claims at all. It suggests that its claims are a collective concept capable of aggregative adjudication. *U.S. Opposition to Motion* at 30 ("The United States' Claims are a collective concept.... The costs associated with medical care for each federal beneficiary are not separate claims and the United States' claims are not derived from the claims of individual federal beneficiaries; the costs are merely a component of the United States' unitary claims."); *and id.* at 31 ("Whether the United States must ultimately identify individual patients to overcome objections is an issue of sufficiency of evidence measured at the trial of the objections."). Similarly, it has argued that it should be allowed to establish product identification through the use of market share data. *See United States' Brief in Support of Second Motion to Compel Discovery from Debtor Dow Corning Corporation ("U.S. Br. in Support of Second Motion to Compel")* at 12 (arguing that market share data may be used to establish product identification circumstantially); *cf. U.S. Ex. 25* (breast implant market share data from Exhibit 26 to the Movants' confirmed joint plan of reorganization).

The Government suggests that it should be excused from having to prove that a Dow Corning breast implant was involved in every incident of medical care for which it seeks recovery. On its face the Government's assertion makes virtually no sense. There are only a handful of procedural mechanisms that allow for some type of collective proceeding: class actions, consolidations and claim joinder. *See* F.R.Civ.P. 18(a), 23 and 42(a). The Government has not invoked any of these aggregative techniques.[34] Instead, the United States insists that its ability to proceed in the manner suggested derives solely from the statutes themselves. That is, that the MCRA and the MSPA enable the Government to be reimbursed for tens of millions of dollars of medical care allegedly provided to countless federal beneficiaries by, essentially, just showing up at the courthouse. In the Government's view: it is under no obligation to identify the beneficiaries to whom such medical care was provided; it is under no obligation to specify the medical care that was furnished to each of these beneficiaries; it is under no obligation to provide a detailed breakdown of the costs of such care; and it does not have a duty to demonstrate that each inci-

**34.** That the Government chose not to rely on any of these procedural mechanisms is not surprising. To begin with, it is doubtful that application of one of these procedural tools to the Government's claims is appropriate. *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (casting great doubt on the propriety of adjudicating mass-products-liability cases as class actions inasmuch as individual issues typically predominate over common issues and because variations in state law would make such a proceeding unmanageable); 8 *Moore's Federal Practice,* § 42.11[1] (observing that Federal Rule of Civil Procedure 42(a) can be used only to consolidate separate, well-pleaded actions that are already pending before the court); 4 *Moore's Federal Practice,* §§ 18.20–23 (discussing limitations on claim joinder).

More importantly, even if one of these procedural mechanisms were applicable, the Government still would be required to present individualized proofs with respect to each federal beneficiary. *Ortiz v. Fibreboard Corp.,*

527 U.S. 815, 119 S.Ct. 2295, 2314, 144 L.Ed.2d 715 (1999) (stating that no reading of Rule 23(a) can ignore "the [Rules Enabling] Act's mandate that rules of procedure shall not abridge, enlarge or modify any substantive right") (internal quotes and citations omitted); *Cimino v. Raymark Indus., Inc.,* 151 F.3d 297 (5th Cir.1998) (class action rule did not alter defendant manufacturer's Seventh Amendment right to a determination of whether its products caused injury to each individual plaintiff); *Stacey v. Charles J. Rogers, Inc.,* 756 F.2d 440, 442 (6th Cir.1985) (stating that consolidation is merely a tool of judicial economy, and that it does not "merge ... [independent] suits into a single cause, or change the rights of the parties"); 4 *Moore's Federal Practice,* § 18.20 ("Rule 18, like other Rules regarding joinder, prescribes only the *procedural circumstances* in which a litigant may assert a claim."); *see also* 28 U.S.C. § 2072(b) (Rules Enabling Act—providing that rules of civil procedure, such as Rule 18(a), shall not alter an entities substantive rights).

dence of medical care for which the Government seeks reimbursement was necessitated by an injury caused by the Debtor. Apparently, everyone is just supposed to accept at face value the United States' assertion that it is owed tens of millions of dollars from the Debtor. The illogic of the Government's argument is self-evident. If the United States is suing a defendant over a single federal beneficiary's treatment, can it prevail without identifying the patient, the benefits provided or the costs of such benefits? The answer to this question is obviously no. And if it cannot do so under those circumstances, why should it be able to do so when it is suing for benefits supplied to 100 patients?

The manifest unfairness the Government's position is obvious. Fortunately, there is no legal authority that supports the Government's extreme argument. Legislative history, not surprisingly, is silent on the matter. There are no published opinions where such an approach is discussed, let alone endorsed. More importantly, the Government's contention is belied by the language of both statutes.

Both the MCRA and the MSPA are couched in terms of providing the Government with a right to recover the costs of medical care provided to an individual federal beneficiary. The MCRA provides the Government with a right to recover the costs of medical care furnished to "a person." 42 U.S.C. § 2651(a). The MSPA similarly provides the Government with a right to be reimbursed for the costs of "an item or service" paid for on behalf of a Medicare beneficiary. 42 U.S.C. § 1395y(b)(2)(B)(ii). And as demonstrated in Part V *supra,* when the Government brings an action against an alleged tortfeasor under the MCRA or against a liability insurer under the MSPA, its claim will be based on a tort. In such situations, therefore, the Government's right of recovery will depend upon its ability to prove that the defendant (or its insured in the case of the MSPA) committed a tort against the federal beneficiary in question and that

this tort necessitated the medical care which the Government paid for or provided. The elements of the Government's tort claim will be governed by the substantive law of the applicable state. And like every other plaintiff, the Government must prove every element of its tort claim. This analysis will hold true with respect to every item of medical care for which the Government seeks reimbursement. *See supra* Part V.A (explaining the Government's rights under the MCRA) *and supra* Part V.B (explaining the Government's rights under the MSPA).

Thus, the Government possesses a distinct and separate cause of action for each federal beneficiary whose medical care was necessitated by an alleged tort. And each of these individual causes of action must stand or fall on its own merits. This conclusion is only underscored by the fact that both statutes subrogate the Government to the substantive rights of the federal beneficiary who is the tort victim. For these reasons, the Court rejects the Government's aggregation theory as well as the notion that it need not present individualized proofs with respect to each federal beneficiary. Consequently, product identification is an essential element of the Government's claims and it must be established with respect to each item of medical care for which the Government seeks reimbursement.

The Government's fall-back position is that it should be permitted to establish product identification through the use of market share data: "If, at trial, the United States lacks direct evidence to prove that an implant is a Dow Corning implant, the United States may circumstantially demonstrate that an implant which resulted in injuries in a particular instance was a Dow Corning implant by use of market share evidence." *U.S. Br. in Support of Second Motion to Compel* at 12 (citing *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, 940 (1980) (Richardson, J., dissenting)).

Of course a plaintiff may prove the essential elements of her claim, including causation, through the use of circumstantial evidence. *See, e.g., Thrasher v. B & B Chem. Co.,* 2 F.3d 995, 997 (10th Cir.1993); *Fought v. Hayes Wheels Int'l, Inc.,* 101 F.3d 1275, 1277 (8th Cir.1996); *Orth,* 980 F.2d at 637. While market share data is circumstantial evidence, there are no *traditional* products liability cases of which this Court is aware where the plaintiff was permitted to rely solely on evidence of this sort to establish product identification. *Cf. Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 936–37 (observing that market share data pertaining to the five defendants in that case would typically be insufficient to establish product identification because "there is a possibility that none of the five defendants ... produced the offending substance and that the responsible manufacturer, not named in the action, will escape liability."); *see also In re Beverly Hills Fire Litig. (Kiser v. Bryant Electric),* 695 F.2d 207, 219 (6th Cir.1982) (liability cannot be established through "speculation, supposition or surmise"); *Orth,* 980 F.2d at 637 (circumstantial evidence must establish more than a "mere possibility").

In fact, the only situation in which courts have allowed plaintiffs to use market share data to establish product identification is where the so called "market-share liability theory," also referred to as a "non-identification" theory, was applicable. This theory of liability was first adopted in *Sindell,* a case involving litigation of the product diethylstibestrol (DES).

From 1941 to 1971, DES was prescribed during pregnancy for the purpose of preventing miscarriages. *Sindell,* 163 Cal. Rptr. 132, 607 P.2d at 925. The Food and Drug Administration ordered DES removed from the market in 1971 when it was discovered that it could cause cancer in the daughters of the women who used it. *Id.* For a number of reasons, identifying the manufacturer of the DES that the plaintiff's mother had taken was a virtual impossibility. Approximately 300 companies made DES during the 24 years that it was on the market. A common formula was used by all manufacturers so that each company's product was fungible and interchangeable with every other company's product. As a result, DES was typically prescribed by its generic name and pharmacists would fill prescriptions using whatever brand was on hand. *Id.* at 926. The long latency period of the disease—a minimum of 10 to 12 years—only compounded the problem. Thus, through no fault of the plaintiff, the specific manufacturer of the DES that caused the plaintiff's injuries could not be identified. *Id.* at 936. Rather than leave the plaintiff remediless, the court adopted the market-share theory. *Id.* at 937.

The market-share theory "imposes presumptive liability based upon a manufacturer's share of the market of the injury-causing product, shifting the burden of proof to the defendants to show that they could not have made the specific product which injured the plaintiff." 63 *Am Jur 2d,* Products Liability § 179. The theory has been adopted by some jurisdictions and rejected by others. *Compare Mulcahy v. Eli Lilly & Co.,* 386 N.W.2d 67, 75–76 (Iowa 1986) (rejecting market-share theory because "awarding damages to an admitted innocent party by means of a court-constructed device that places liability on manufacturers who were not proved to have caused the injury involves social engineering more appropriately within the legislative domain") *and Smith v. Eli Lilly & Co.,* 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324, 337 (1990) (rejecting theory as unsound and "too great a deviation from our existing tort principles"); *with Conley v. Boyle Drug Co.,* 570 So.2d 275, 286 (Fla.1990) (adopting variation of market-share theory in DES case); *Hymowitz,* 541 N.Y.S.2d 941, 539 N.E.2d at 1078 (same).

Where the theory has been adopted, an absolute predicate to its application is that the product in question be

fungible and generic in nature: that is, one defendant manufacturer's product must be indistinguishable from the next manufacturer's product. *Bly v. Tri–Continental Indus., Inc.,* 663 A.2d 1232, 1243–45 (D.C. 1995); *Hymowitz,* 541 N.Y.S.2d 941, 539 N.E.2d at 1075; *Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 936; 63 *Am Jur 2d,* Products Liability § 183. The mere fact that it may be difficult for the plaintiff to establish product identification is insufficient to invoke the market-share theory. *Bly,* 663 A.2d at 1243; *Conley,* 570 So.2d at 286.

■ Moreover, regardless of the product at issue, the theory should not be applied when the plaintiff does in fact possess information pertaining to manufacturer identity. *Conley,* 570 So.2d at 285–86 (stating that, even in a DES case, when the plaintiff has the ability to identify the manufacturer that produced the injury-causing product there is no reason to deviate from traditional tort remedies); *In re Related Asbestos Cases,* 543 F.Supp. 1152, 1158 (N.D.Cal.1982) (holding that, because the plaintiff had information concerning the identity of the manufacturers who caused his alleged injuries, the rationale for applying the market-share theory was not present).

The market-share theory is inapplicable to the present context for a number of reasons. First, the Government is either in possession of or has access to the medical records that should contain evidence of product identification. *See, e.g., U.S. Opposition to Motion* at 4 (acknowledging that information concerning product identification has been found "in a beneficiary's underlying medical treatment records"). This alone precludes the United States from using the market-share theory. The Government complains that pulling the medical files and combing through them for the requisite information is too burdensome. *Id.* at 14. But as noted, mere difficulty in producing evidence is not sufficient to excuse a party having to do so.

More importantly, breast implants are not fungible products. The various manufacturers used different designs and compositions thereby making each manufacturer's product an identifiable product. *In re New York State Silicone Breast Implant Litig.,* 166 Misc.2d 85, 631 N.Y.S.2d 491, 494 (N.Y.Sup.Ct.1995). For this reason, most breast implant plaintiffs have been able to identify the manufacturer of their implant, demonstrating that the underlying predicate which justifies application of the market-share theory is not present with breast implants. *Id.* Consequently, no court has permitted a breast implant plaintiff to utilize the market-share theory to prove her claim. *Id.; cf. In re Minnesota Breast Implant Litig.,* 36 F.Supp.2d 863, 876 (D.Minn.1998) (declining to apply the market-share theory because the theory was not recognized by the applicable state law); *Lee,* 721 F.Supp. at 92–94 (The applicable state law did not recognize the market-share theory, but the Court concluded that the theory would not be applicable to breast implants in any event).

■ Once again, the above analysis pertains to the portions of the HCFA and DoD proofs of claim that are supported by beneficiaries whose names did not match with names found in the Debtor's databases. As to this aspect of the Government's claim there is no dispute that it has failed to produce any meaningful evidence regarding product identification. The United States' defense amounts to a list of excuses for why it has not done so. These excuses carry no persuasive weight. Accordingly, the motion for summary judgment is granted as to this portion of the United States' claims.

### D. HCFA and DoD Beneficiaries Identified in Matching Process

■ The matching of the 15,048 federal beneficiaries' names produced by the Government with the confidential database revealed that approximately 4,908 of these beneficiaries had filed a proof of claim against the Debtor. It appears that most

of these matches are either HCFA or DoD beneficiaries. But as for those matches which are IHS or VA beneficiaries, they are discussed separately in Part VI.F below.

To defeat this aspect of the Motion for summary judgment, the United States must present evidence that is sufficient for a reasonable jury to return a verdict in its favor. *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505; 11 *Moore's Federal Practice,* §§ 56.13[3] and 56.30[7][a]. The Government maintains that the matching process satisfies this requirement. *Transcript,* September 2, 1999 at 103 and 108. It reasons that, when these claimants filed proofs of claim with this Court, they asserted under penalty of perjury that they had been injured by a breast implant manufactured by or containing materials supplied by the Debtor. *Id.* The Government places too much weight on this evidence.

The breast implant proofs of claim did indeed require claimants to identify the manufacturer of their implant, at least to the best of their ability. This information was primarily sought for claims administrative purposes and for matters such as classification for voting on an eventual plan of reorganization. There was never an expectation, even by breast implant claimants, that they would be able to satisfy the product identification element of their claims by simply checking a box on their proof of claim form. In fact, the now confirmed plan of reorganization, jointly proposed by the Movants, speaks directly to this issue. The claims resolution procedures that are annexed to the plan require even settling breast implant claimants to submit acceptable proof of product identification, such as hospital records, implant labels and records of the implanting surgeon. *See Annex A to the Settlement Facility and Fund Distribution Agreement* at § 6.02(b)(ii) and *Schedule I* thereto.

It would certainly be ironic if the Government were held to a lower standard of proof than the claimants to whom it is subrogated. And as the Court long ago

informed the Government, a claimant who files a proof of claim and checks the box alleging that she has a Dow Corning breast implant "could be wrong … A lot of women file[d] proofs of claim saying 'I don't know what I have, but I'm protecting my rights.'" *Transcript,* August 6, 1998 at 197–98.

While the proofs of claim are some evidence of product identification upon which the Government can rely, they are not by themselves sufficient to sustain a reasonable jury's verdict on this issue in its favor. *See, e.g., Beverly Hills Fire Litig.,* 695 F.2d at 219 (circumstantial evidence sufficient to establish an element of a claim must give rise to more than "speculation, supposition or surmise"); *Orth,* 980 F.2d at 637. The Government must, therefore, be able to show something more. Unfortunately for the Government, it has not produced anything more with respect to its HCFA and DoD claims. Because the evidence on the record is inadequate to establish product identification at trial, the Court will grant summary judgment disallowing the portion of the Government's claims that is based upon these HCFA and DoD beneficiaries.

### E. VA and IHS Beneficiaries

Still left to be discussed are the two-to-three-hundred VA and IHS beneficiaries with respect to whom the Government did produce medical files. The Court does not make any determination at this time with respect to this portion of the Government's claim. It is not clear whether either side proffered any of these files into evidence. The Court could attempt to draw inferences from this fact, but will refrain from doing so. Instead, the motion will be denied without prejudice. The Movants will be permitted to renew their motion with a focus on the evidentiary force of these files. Once one side or the other actually introduces these files as evidence in the renewed motion, the Court may very well be able to rule definitively on whether this evidence supports the Government's con-

tention that there is a genuine issue of material fact with respect to the essential elements of its claims.

### F. Request to Disallow or Subordinate Government's Claims Pursuant to §§ 502(e)(1) and 509(c)

The Movants also assert that any portion of the Government's claim that is not disallowed for lack of evidence should be disallowed pursuant to 11 U.S.C. § 502(e)(1) or subordinated to the individual claims of the federal beneficiaries who form the basis of its claims pursuant to 11 U.S.C. § 509(c).

Section 502(e)(1) provides:

(e)(1) Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, *the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that—*

(A) such creditor's claim against the estate is disallowed;

(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution; or

(C) *such entity asserts a right of subrogation to the rights of such creditor under section 509 of this title.*

11 U.S.C. § 502(e) (emphasis added).

Section 509 provides in relevant part:

(a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on . . . a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

(b) Such entity is not subrogated to the rights of such creditor to the extent that—

(1) a claim of such entity for reimbursement or contribution on account of such payment of such creditor's claim is—

(A) allowed under section 502 of this title;

(B) disallowed other than under section 502(e) of this title . . . .

(c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on . . . such creditor's claim, until such creditor's claim is paid in full . . . .

11 U.S.C. § 509.

The Court previously held that the United States is an entity that is liable with the Debtor on the claims of the primary breast implant claimants. *Dow Corning*, 244 B.R. at 714–15.

■ These two Code provisions enable the co-liable third party to elect its path of recovery: either as a reimbursement or contribution creditor under § 502 or as a subrogee under § 509. 4 *Collier on Bankruptcy* ¶ 502.06[2][e]. However, the codebtor's choice is constrained by § 509(c). That subsection provides that, regardless of whether the codebtor chooses to pursue a subrogation claim under § 509 or a reimbursement/contribution claim under § 502, its claim shall be "subordinate[d] to the underlying creditor's claim until such time as the codebtor has paid the underlying creditor in full." *Id.* at ¶ 502.06[6] (citing *Leavell v. Karnes*, 143 B.R. 212 (S.D.Ill. 1990)). The Government's codebtor claim seeks recovery for medical treatment that it has already provided and, as a result, it has paid its debt to the underlying personal injury claimant in full. Therefore, if any portion of the Government's claim ultimately survives summary judgment, subordination pursuant to § 509(c) would be inappropriate. Whether any portion of the Government's claim that survives summary judgment is subject to disallowance under § 502(e) would depend on the merits of the Government's claim and it would be premature to address such matters in this opinion.

## VII. Postscript

The Government asserted claims against the Debtor for a minimum of $92 million. But despite the magnitude of its supposed claims, the Government did precious little to prove them. Regrettably, the Government's track record in this case is one of delay and intransigence. And one is left with the impression that the Government never seriously intended to take the steps necessary to prove its claims against the Debtor. Except for the portion of the Government's claims discussed in Part VI.E, it has utterly failed to produce evidence that would establish an essential element of its claim—that one of the Debtor's products was involved in the medical care for which it seeks recovery. The Government's attempts to excuse itself from having to produce such evidence were without merit. Accordingly, and except as otherwise set forth in Part VI.F, the Movants' Motion for Summary Judgment Disallowing the claims of the United States will be granted.